# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# OWENSBORO DIVISION

**CIVIL ACTION NO. 4:12-CV-00044-JHM**

**INSTITUTIONAL LABOR ADVISORS, LLC**                                   **PLAINTIFF**

**V.**

**ALLIED RESOURCES, INC.**                                                              **DEFENDANT/
COUNTER-PLAINTIFF**

**V.**

**INSTITUTIONAL LABOR ADVISORS, LLC and
DAVID S. SMITH**                                                    **COUNTER-DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Institutional Labor Advisors, LLC ("ILA") is a limited liability corporation that provides consulting, business, and compliance services to mining industry clients with respect to acquisitions and operational matters. On April 4, 2012, ILA filed this breach of contract action against Allied Resources, Inc. ("Allied"), alleging that Allied breached a Compensation Agreement that it had entered into with ILA. (Compl. [DN 1].) Under the Compensation Agreement, Allied had agreed to "pay to ILA an amount in cash equal to five percent (5%) of the value of any Distribution . . . at such time as any such Distribution is paid." (Comp. Agr. [DN 1-1] 1.) ILA states that while certain distributions were paid, Allied failed to compensate it. (Compl. [DN 1] ¶¶ 11, 13, 16-17.)

Allied challenges the Compensation Agreement's enforceability. In addition, Allied filed a counterclaim against ILA and David Smith ("Smith"), ILA's principal and Allied's former counsel. In its counterclaim, Allied alleges that Smith tortiously interfered with its contract and business expectancy. Allied's counterclaim stems from the belief that Smith falsely represented to Alliance Resource Partners, LP ("Alliance") that ILA had an ownership interest in Allied, or in Allied's assets, under the Compensation Agreement. (Answer, Affirmative Defenses & Countercl. [DN 9].)

This matter is now before the Court on ILA and Smith's summary judgment motion [DN 76], which seeks dismissal of Allied's counterclaim. Also before the Court is Allied's motion for oral argument [DN 97]. Fully briefed, the matter is ripe for decision. For the following reasons, ILA and Smith's summary judgment motion [DN 76] is **GRANTED** in part and **DENIED** in part. Further, Allied's motion for oral argument [DN 97] is **DENIED**.

**I. BACKGROUND**

The parties agree that in early 2012, Allied was engaged in negotiations with Alliance for the sale of certain coal reserves located in western Kentucky. These reserves were known as the Onton Reserves. (See Answer, Affirmative Defenses & Countercl. [DN 9] ¶ 3; Mem. in Supp. of Summ. J. on Def.'s Countercl. [DN 76-1] 8-9.) At that time, the proposed purchase price for the acquisition was approximately $120 million. (See Richard E. Davis Dep. [DN 77] 123 (noting that the proposal was $120 million, plus $2.5 million paid $500,000 per year for 5 years); Jeffrey L. Hallos Declaration [DN 85-7] ¶¶ 13-14 (noting that on January 4, 2012, Allied sent a draft purchase agreement to Alliance that included a proposed price of $125 million and also noting that on January 12, 2012, Alliance sent a draft purchase agreement to Allied that included a proposed price of $122.5 million).) On January 31, 2012, however, Alliance informed Allied that it would only pay $100 million. (See Davis Dep. [DN 77] 121-22, 129-30; Hallos Declaration [DN 85-7] ¶ 15.) The parties offer differing accounts on why Alliance decided to reduce the purchase price.

ILA and Smith argue that Alliance's decision to reduce the price to $100 million, and thus not go forward with the transaction at $120 million, "had nothing at all to do with Smith, ILA, or anything Smith had allegedly done." (Mem. in Supp. of Summ. J. [DN 76-1] 9.) In support of this argument, ILA and Smith highlight the testimony of Richard E. Davis, Alliance's general counsel. In his deposition, Mr. Davis unequivocally stated that Alliance's senior management had reduced the purchase price to $100 million after deciding that the economics of the potential

2

acquisition did not support a $120 million price. (Davis Dep. [DN 77] 121-29, 140.) Mr. Davis also stated that the decision had "absolutely nothing" to do with Smith—and that it was based on "pure economics." Mr. Davis outlined several economic considerations which he stated impacted the decision to reduce the price, such as: (1) a decline in market price for coal; (2) discovering during due diligence that there might be higher operating costs; (3) a likelihood for increased capital costs; and (4) concerns over the ability to increase existing levels of production. (See id.)

Allied counters that Alliance's decision to reduce the purchase price to $100 million, and thus not go forward with the transaction at $120 million, resulted from Smith's interference with the Allied-Alliance transaction. In support of this claim, Allied first notes that in early- to mid-January, Smith left a message with Chester Thomas, Allied's principal, stating "Tell Chester the number is 120." (Chester Thomas Dep. [DN 85-4] 335; Call Log [DN 85-5]; Chester Thomas Declaration [DN 85-6] ¶ 17.) According to Allied, this was a "clear reference to the purchase price of $120 million then being discussed by Allied and Alliance," thus indicating that Smith knew about the Allied-Alliance transaction in early- to mid-January. (Allied's Resp. [DN 85] 5.)

Next, Allied relies on Smith's call log, which shows that Smith called Alliance's CEO, Joe Craft, on December 6, 2011. (See Call Log [DN 105-1] 4.) Alliance's general counsel, Mr. Davis, stated in his deposition that there was a call between Smith and Mr. Craft before February 23, 2012, although neither he nor Mr. Craft could recall the date of this call. (Davis Dep. [DN 85-2] 173-74, 196, 204.) According to Mr. Davis, the substance of the conversation was as follows:

> David [Smith] told Mr. Craft that, you know, you don't – you, Joe, don't need to respond to me. You probably have confidentiality obligations, but I've heard that Alliance is considering acquiring Green River or Chester's assets, however he would have phrased it. And you probably recall, you, Joe, probably recall the work, the legal work I did for Chester when he was acquiring those assets from P&M and I just want you to know that the – my compensation arrangement with Chester gave me an interest in the assets and – or the business or the company.

3

(Davis Dep. [DN 77] 160.) According to Allied, by stating that he had an interest in Allied, or in Allied's assets, Smith made a false representation to Alliance, which interfered with the Allied-Alliance transaction. Allied states that Smith's statement to Mr. Craft caused Alliance to develop concerns regarding whether Smith had an ownership-type of interest in the assets they intended to purchase, which ultimately caused Alliance to reduce its offer. (Davis Dep. [DN 85-2] 198-99, 201-02.) Allied notes that the communication between Smith and Mr. Craft was "before Alliance signed its contract with Allied on February 23, 2012, and well before Alliance dropped its offer from $120 million to $100 million in late January 2012." (Allied's Sur-Reply [DN 112] 4.)

As additional support of its claim that Alliance reduced the purchase price due to Smith's interference, Allied highlights the history of negotiations between Allied and Alliance. Specifically, Allied highlights that when Allied and Alliance were in early negotiations, in December of 2011, Alliance raised what it perceived to be a potential title issue that reduced the property's value. As a result, on December 11, 2011, Alliance reduced the purchase price from $130 million to $120 million. Allied disagreed that the perceived title issue impacted the property's value. Thus, Allied's representatives had several discussions with Alliance's representatives in an attempt to convince them that this was the case. By contrast, when Alliance reduced the purchase price from $120 million to $100 million, Alliance never discussed its rationale with Allied. Instead, Alliance gave a draft purchase agreement to Allied that contained a proposed price of $100 million and refused to explain the reason for its price reduction. (Hallos Declaration [DN 85-7] ¶¶ 9-10, 15; Thomas Declaration [DN 85-6] ¶¶ 11-13, 16, 18.) Allied argues that Alliance's refusal to explain the reason for its price reduction is additional evidence of Smith's tortious interference.

Regardless of the rationale underlying Alliance's decision to reduce the purchase price, it is clear that on February 20, 2012, Alliance raised the question of Smith's rights or interests with Allied. (See Hallos Declaration [DN 85-7] ¶ 18; Thomas Declaration [DN 85-6] ¶ 26.) Allied's

counsel responded on February 23, 2012, advising that "Frost Brown Todd is not aware that the Sellers or LLCs have any obligations to, or contracts with, David Smith or any of his affiliates that the Purchaser will be assuming in connection with [the proposed transaction]." (E-mail from Jeffrey L. Hallos [DN 76-15].) This response eased Alliance's concerns about assuming liability to ILA. Allied and Alliance signed a purchase agreement for $100 million on February 23, 2012. Alliance issued a press release on February 24, 2012 disclosing the purchase and sale transaction. (See Press Release Announcing Allied-Alliance Agr. [DN 76-16].)

Approximately two weeks after the press release, on March 8, 2012, Smith called Joe Craft, Alliance's CEO. (See Mem. in Supp. of Summ. J. [DN 76-1]; Call Log [DN 105-1] 4.) According to ILA and Smith, in this conversation, Smith advised Mr. Craft (for the first time) that he was a party to the Compensation Agreement with Allied because he did not want Mr. Craft to learn of ILA's potential interest in distributions from the Allied-Alliance transaction after the fact. (Mem. in Supp. of Summ. J. [DN 76-1] 10-11; Davis Dep. [DN 77] 160-61.) ILA and Smith suggest that Smith felt obligated to contact Mr. Craft because Mr. Craft was Smith's friend and because Alliance was ILA's long-standing client. (Mem. in Supp. of Summ. J. [DN 76-1] 10, 16.) However, Allied characterizes the call as further interference. According to Allied, Smith again inserted himself into the transaction and falsely asserted that ILA had an interest in Allied—or in Allied's assets. (See Allied's Resp. [DN 85] 9; Davis Dep. [DN 77] 160-62.)

The next day, on March 9, 2012, Smith wrote to Allied's principal, Chester Thomas. In that letter, Smith asked Mr. Thomas to provide information regarding all of the distributions that had been made since the effective date of the Compensation Agreement. In addition, Smith told Mr. Thomas that he had seen the announcement regarding Allied's sale of the Onton Reserves to Alliance. Smith stated that those "reserves and assets . . . are the subject of the Allied Resources

5

– ILA Distribution Agreement." (Letter [DN 76-17].) Smith sent a blind copy of the letter to Mr. Craft, on which he added a handwritten note stating: "Joe, Thank you for your interest in this[.] David." (Id.) Allied characterizes this conduct as additional interference.

ILA and Smith respond that this conduct did not constitute interference. In support, they focus on Smith's deposition testimony, where he stated that he sent Mr. Craft a copy of the letter because Mr. Craft had suggested that Alliance could potentially help bring closure to the issues between ILA and Allied. (See David S. Smith Dep. [DN 76-4] 325-26.) According to ILA and Smith, Mr. Craft subsequently advised Smith that Smith and Mr. Thomas would have to resolve their issues on their own, without any involvement from Alliance. (Davis Dep. [DN 77] 160-62.)

Regardless of Smith's rationale for contacting Mr. Craft in March 2012, it is clear that the contact heightened Alliance's concern about Smith's interest in the assets being purchased. (See id. at 200, 176-78.) As a result, Alliance told Allied that until it agreed that Smith and ILA had no interest in the assets Alliance was purchasing, Alliance would consider certain warranties breached and might not close the transaction. (See Hallos Declaration [DN 85-7] ¶ 22; Thomas Declaration [DN 85-6] ¶ 29.) Allied states that because it was concerned about the potential for Alliance to pull out of the transaction, Allied's representatives spent much time meeting with Alliance, resulting in approximately $10,000 of fees that Allied would not have incurred but for Smith's interference. Further, Allied states that it "compromised on certain issues that it would not otherwise have compromised on in the final negotiation of the purchase agreement with Alliance, including by acquiescing in Alliance's proposal that the purchase price should be reduced to $100 million." (Allied's Resp. [DN 85] 10, 15.)

Ultimately, Alliance's fears were dissipated when its counsel was given an opportunity to review the Compensation Agreement. Based on this review of the agreement, Alliance concluded

that it was not at risk of assuming Allied's liability to ILA. (See Davis Dep. [DN 85-2] 186-89.) Consequently, on April 2, 2012, Allied and Alliance closed their purchase and sale transaction at the previously agreed-upon purchase price of $100 million.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## III. DISCUSSION

In its counterclaim, Allied asserts that "ILA and Smith are liable to Allied for tortiously interfering with Allied's contract and business expectancy with Alliance." (Answer, Affirmative Defenses & Countercl. [DN 9] ¶ 9.) While it is somewhat unclear, Allied seems to be raising two

separate and distinct claims: a tortious interference with contract claim and a tortious interference with business expectancy claim. Under Kentucky law, these claims are separate torts, with some common but also certain distinct elements. See Ventas, Inc. v. Health Care Prop. Investors, Inc., 635 F. Supp. 2d 612, 618-627 (W.D. Ky. 2009) (analyzing both of the torts). The Court will first address Allied's tortious interference with contract claim. It will then address Allied's tortious interference with business expectancy claim.

### A. TORTIOUS INTERFERENCE WITH CONTRACT

To prove a tortious interference with contract claim, Allied must establish that: (1) an enforceable contract existed between Allied and Alliance; (2) Smith had knowledge of the contract; (3) Smith intended to cause Alliance to breach the contract; (4) Smith's conduct caused Alliance to breach; (5) the breach resulted in damages to Allied; and (6) Smith had no privilege or justification to excuse his conduct. See Ventas, Inc., 635 F. Supp. 2d at 618-19 (citations omitted). In the present case, as correctly noted by ILA and Smith, the first two elements are not at issue. An enforceable contract existed between Allied and Alliance as of February 23, 2012 and Smith had knowledge of that contract. But Allied cannot prove the remaining elements of its tortious interference with contract claim because Alliance did not breach the February 23, 2012 contract.

On April 2, 2012, the Allied-Alliance transaction closed for $100 million, the contract price. This successful closing precludes Allied's interference with contract claim. See id. at 621 (rejecting an interference with contract claim where a party completed an acquisition that was the subject of the alleged interference); CMI, Inc. v. Intoximeters, Inc., 918 F. Supp. 1068, 1079 (W.D. Ky. 1995) (noting that "[a]t a minimum," an interference with contract action requires proof that the third-party breached). In its response, Allied concedes that it has no viable claim for tortious interference with contract. (See Allied's Resp. [DN 85] 16.) Thus, ILA and Smith's summary judgment motion is **GRANTED** in part as to that claim.

**B. TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

In National Collegiate Athletic Association v. Hornung, the Kentucky Supreme Court set forth the principles governing the tort of intentional interference with prospective advantage, which is also known as the tort of interference with business expectancy. In so doing, the Court held that § 776B of the Restatement (Second) of Torts is a fair reflection of Kentucky law. 754 S.W.2d 855, 857 (Ky. 1988). This section states:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (2d) Torts § 776B. To prove a tortious interference with business expectancy claim, Allied must show that: (1) there was a valid business relationship or expectancy between Allied and Alliance; (2) Smith had knowledge of this relationship or expectancy; (3) Smith's intentional act of interference; (4) Smith's improper motive; (5) causation; and (6) special damages. See Ventas, Inc., 635 F. Supp. 2d at 621 (citation omitted).

The parties disagree over the evidence that the Court may consider when analyzing these elements. ILA and Smith argue that the Court can only consider evidence of acts that occurred prior to February 23, 2012. According to them, Allied's alleged business expectancy of closing the transaction with Alliance for $120 million was realized when it signed the contract for $100 million. Thus, any acts that occurred after February 23, 2012—including Smith's alleged March communications with Mr. Craft—are immaterial. (Countercl. Defs.' Reply [DN 95] 4.) Allied responds that such acts are still material because while the contract had been signed, the deal had not yet closed. (Allied's Sur-Reply [DN 112] 4.) According to Allied, its business expectancy

was to close the transaction at $120 million while only expending necessary costs. However, due to Smith's interference, it closed at $100 million and expended additional, unnecessary costs in the form of added legal expenses, which were necessary to calm Alliance's fears. (Id.) Further, Allied suggests that the March contacts between Smith and Alliance are, at a minimum, evidence of the content and character of Smith's earlier contacts with Alliance. (Id.)

For purposes of this Memorandum Opinion and Order only, the Court assumes, without deciding, that ILA and Smith are correct. Thus, the Court will only consider evidence of acts that occurred before February 23, 2012. Even when the Court does so, however, it concludes that Allied has presented sufficient evidence to overcome ILA and Smith's summary judgment motion.

**Valid Business Expectancy between Allied and Alliance.** Allied's interference with business expectancy claim is based on the contention that Allied had a valid business expectancy to close the transaction with Alliance for $120 million. Thus, in their summary judgment motion, ILA and Smith argue that "there is no evidence that Allied had a valid business expectancy to receive $120 million in connection with the Alliance transaction." (Mem. in Supp. of Summ. J. [DN 76-1] 15.) A valid business expectancy exists whenever there is "a reasonable likelihood or a probability, not mere wishful thinking" that a business relationship will come about. Ventas, Inc., 635 F. Supp. 2d at 621 (citations omitted). This reasonable likelihood or probability "need only exist prior to the interference." Id. at 622.

ILA and Smith argue that Allied "had no valid business expectancy in anything beyond the actual negotiated contract price of $100 million." According to ILA and Smith, "Alliance was unwilling to proceed with the transaction at [$120 million] because Alliance concluded that the economics of the deal did not support that price." (See Mem. in Supp. of Summ. J. [DN 76-1] 20.) In support, ILA and Smith heavily rely on the deposition testimony of Alliance's general

counsel, who stated, in the clearest of terms, that the $20 million reduction in its purchase price was based on an economic analysis and had nothing to do with Smith.

The Court finds that ILA and Smith's argument is highly persuasive. In light of the testimony of Alliance's general counsel, a reasonable jury could certainly find that Allied did not have a valid business expectancy to receive $120 million in connection with the Alliance transaction. But when considering a summary judgment motion, the Court must review the evidence in the light most favorable to Allied, the non-moving party, and draw all inferences in its favor. When it does so, it is left with no option but to conclude that Allied has presented sufficient evidence to support its contention that it had a valid business expectancy to receive $120 million.

Allied has put forth evidence that the parties were negotiating in the $120 million range in late 2011, prior to the alleged interference. At that time, there was a reasonable likelihood or a probability that Allied and Alliance would sign a contract in the $120 million range. While ILA and Smith argue that this is not the case because Alliance concluded that the economics of the deal did not support a $120 million price, Alliance has put forth sufficient evidence to refute the belief that economic considerations caused the price reduction. Indeed, as set forth below, there is a genuine issue of material fact as to Alliance's rationale for its price reduction. Thus, Allied has offered sufficient evidence that it had a valid business expectancy to receive $120 million prior to the alleged interference.

**Smith's Knowledge of this Expectancy.** Allied has put forth evidence that in early- to mid-January, Smith left a message with Mr. Thomas, Allied's principal, stating "Tell Chester the number is 120." According to Allied, this was a reference to the purchase price of $120 million then being discussed by Allied and Alliance, thus indicating that Smith knew about the Allied-

Alliance transaction in early- to mid-January. (Allied's Resp. [DN 85] 5.) The Court finds that this evidence is sufficient to suggest that Smith knew of Allied's expectancy.

**Smith's Intentional Act of Interference.** The Court must next consider whether Allied has put forth sufficient evidence to support its contention that Smith intentionally interfered with the Allied-Alliance transaction. The Court finds this to be a close question. However, Allied has offered sufficient evidence on this element. In their summary judgment motion, ILA and Smith argue that there is no "evidence that Smith improperly interfered with any Allied business expectancy." (Mem. in Supp. of Summ. J. [DN 76-1] 15.) But the Court finds that Allied has presented circumstantial evidence indicating that Smith interfered with Allied's business expectancy by contacting Mr. Craft and expressing that he had an interest in the assets that were the subject of the purchase and sale transaction.

In this respect, as noted above, Allied has put forth evidence indicating that Smith knew about the Allied-Alliance transaction in early- to mid-January. In addition, Allied has put forth Smith's call log, which shows that Smith phoned Alliance's CEO, Mr. Craft, on December 6, 2011, before Alliance dropped its offer from $120 million to $100 million. Allied has also put forth evidence pertaining to the substance of this conversation: namely, that Smith told Mr. Craft that he had an interest in the assets Alliance intended to purchase. The Court is of the opinion that if these facts are taken as true and all reasonable inferences are drawn in favor of Allied, this evidence, in conjunction with Alliance's alleged refusal during negotiations to provide an explanation for its price reduction despite having previously offered explanations, is sufficient to support this element of Allied's claim.

The Court notes that in their reply brief, ILA and Smith argue that the facts show that Alliance's concerns relating to Smith and ILA did not arise until sometime in late February 2012,

after Alliance had reduced its price. According to ILA and Smith, this fact undermines Allied's argument that the $20 million price reduction had anything to do with Smith. The Court agrees with ILA and Smith that the exchange between Allied and Alliance in late February 2012 undermines Allied's position that the price was reduced due to Smith—and supports ILA and Smith's position that the price was reduced due to economic considerations. But the Court nonetheless finds that based on Allied's offered evidence, there is a genuine issue of material fact regarding Alliance's rationale for reducing the purchase price. It will be left to a jury to decide whether Allied's evidence is sufficient to overcome the strong evidence proffered by ILA and Smith.

**Smith's Improper Motive.** To prevail on its tortious interference claim, Allied must also establish that Smith's alleged interference was improper. See Ventas, Inc., 635 F. Supp. 2d at 622 (citation omitted). The Kentucky Supreme Court has held that to show improper interference, "a party seeking recovery must show malice or some significantly wrongful conduct." Hornung, 754 S.W.2d at 859; see Bourbon Cnty. Joint Planning Comm'n v. Simpson, 799 S.W.2d 42, 45 (Ky. App. 1990) (noting that "malice must be shown, but only in the sense of lack of justification for the interference"). Under Kentucky law, significantly wrongful conduct includes fraudulent misrepresentation, deceit, and coercion. Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 487 (Ky. 1991); Restatement (2d) Torts § 767 cmt. c. The Restatement defines fraudulent as "when, to the knowledge or belief of its utterer, [the statement] is false in the sense in which it is intended to be understood by its recipient." Id. "It does not require that the misrepresentation be independently actionable." Ventas, Inc., 635 F. Supp. 2d at 622.

As the Restatement explains, "the real question is whether the actor's conduct was fair and reasonable under the circumstances." Restatement (2d) Torts § 767 cmt. j. Kentucky courts should consider several factors when making this determination, including: the nature of conduct that was used to interfere, the motive, the interests sought to be advanced by the actor, and the

13

relationships between the parties. See Ventas, Inc., 635 F. Supp. 2d at 622; Hornung, 754 S.W.2d at 858. "Even if evidence is presented which would otherwise make a submissible case, the party whose interference is alleged to have been improper may escape liability by showing that he acted in good faith to assert a legally protected interest of his own." Hornung, 754 S.W.2d at 858. Thus, Smith cannot be liable if he asserted a legally protected interest in good faith. This analysis is, initially, an issue for the Court. "Unless there is evidence of improper interference, after due consideration of the factors provided for determining such, the case should not be submitted to the jury." Id.

ILA and Smith argue that the alleged improper conduct "consists solely of Smith advising the CEO of Alliance, an existing client, that ILA was a party to a compensation agreement with Allied – the company Alliance was acquiring." (Mem. in Supp. of Summ. J. [DN 76-1] 16.) ILA and Smith assert that such a communication "hardly suggests any fraudulent, deceitful, malicious, or coercive conduct," as there is "no evidence that Smith sought to induce Alliance to alter in any way its transaction with Allied." (Id. at 17.) But as Allied correctly notes in its responsive brief, the content of the call between Smith and Mr. Craft is disputed, as Alliance's general counsel stated that Smith told Mr. Craft that ILA had an interest in the assets that were being transferred.

ILA and Smith argue that if Smith did use the general term "interest" to describe ILA's situation with Allied, that still does not support the contention that Smith was acting with some nefarious intent. In other words, ILA and Smith argue that the mere statement that ILA and Smith had an interest in the assets does not undermine the value of the assets or the transaction. However, the alleged statement was made in the midst of a disagreement between Smith and Mr. Thomas over the Compensation Agreement, and the Court finds that taking the facts in the light most favorable to Allied, a jury could reasonably conclude that Smith intended his statement to

be understood as a suggestion that he had an ownership-type of interest. Such a statement would have been false in the sense in which it was intended to be understood.

Indeed, Allied has put forth sufficient evidence that Smith falsely represented the terms of the Compensation Agreement to Mr. Craft to get Alliance to pressure Allied into settling with ILA. The evidence suggests that Smith might have made the statement to Mr. Craft to cause Alliance to question the credibility of Allied's representations—and to fear that its transaction would open it up to liability to ILA and Smith. Based on the record, there is evidence that Smith was not acting altruistically to advance ILA or Smith's legitimate interests, but was instead acting in an improper manner. Thus, granting summary judgment would be inappropriate.

**Causation.** As implied in the above discussion, the Court finds that Allied has presented sufficient evidence of causation to survive ILA and Smith's summary judgment motion.

**Special Damages.** To sustain its tortious interference claim, Allied must also show special damages caused by Smith's alleged interference. Special damages are pecuniary damages that can be proved "to a reasonable degree of certainty." CMI, Inc., 918 F. Supp. at 1081. ILA and Smith argue that there "is no evidence to support any damages" since "Smith's communications played no role whatsoever in the transaction terms or price." (Mem. in Supp. of Summ. J. [DN 76-1].) However, as noted above, Allied has adduced sufficient circumstantial evidence that Smith's communications did impact the Allied-Alliance transaction. Therefore, the Court finds that Allied has presented sufficient evidence of special damages to defeat ILA and Smith's summary judgment motion.

The Court notes that Allied argues that there are two additional categories of special damages asserted in this case: (1) "the damages it incurred when it reasonably reacted to Smith's interference by capitulating to Alliance's bargaining demands"; and (2) "the added legal expenses

incurred by Allied in addressing and alleviating Alliance's concerns about ILA's claims." (Allied's Resp. [DN 85] 23.) ILA and Smith argue that these two categories of damages are not actionable. However, at this point, the Court need not make this determination. Allied has offered sufficient evidence of special damages, in the form of a $20 million reduction in purchase price, to defeat ILA and Smith's summary judgment motion on this element.

**Summary of Elements.** Based on the foregoing analysis, the Court finds that Allied has presented sufficient evidence from which a jury could reasonably find in its favor on its interference with business expectancy counterclaim. ILA and Smith's summary judgment motion is **DENIED** in part as to this claim.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that ILA and Smith's summary judgment motion [DN 76] is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** as to Allied's tortious interference with contract claim. It is **DENIED** as to Allied's tortious interference with business expectancy claim.

**IT IS FURTHER ORDERED** that the Allied's motion for oral argument [DN 97] is **DENIED**.

*Joseph H. McKinley*

Joseph H. McKinley, Jr., Chief Judge
United States District Court

December 16, 2013

cc: counsel of record