CIVIL ACTION NO. 4:12-CV-00044-JHM

INSTITUTIONAL LABOR ADVISORS, LLC                    PLAINTIFF

V.

ALLIED RESOURCES, INC.                              DEFENDANT/
                                            COUNTER-PLAINTIFF

V.

INSTITUTIONAL LABOR ADVISORS, LLC and
DAVID S. SMITH                              COUNTER-DEFENDANTS

## Memorandum Opinion and Order

Institutional Labor Advisors, LLC ("ILA") is a limited liability corporation that provides consulting, business, and compliance services to mining industry clients with respect to acquisitions and operational matters. On April 4, 2012, ILA filed this breach of contract action against Allied Resources, Inc. ("Allied"), alleging that Allied breached a Compensation Agreement that it had entered into with ILA. (Compl. [DN 1].) This matter is now before the Court on various motions filed by the parties concerning the Compensation Agreement's enforceability and meaning.

In specific, this matter is before the Court on ILA's Partial Summary Judgment Motion [DN 141] and Allied's Summary Judgment Motion [DN 149]. Also before the Court are motions to exclude certain expert testimony, including: (1) ILA's Motion to Exclude the Opinions of Peter Ostermiller, Esq. [DN 138]; (2) ILA's Motion to Exclude the Opinions of W. William Hodes, Esq. [DN 139]; (3) Allied's Motion to Exclude or Limit the Expert Testimony of William Fortune and Leslie Haley [DN 140]; (4) Allied's Motion to Exclude or Limit the Expert Testimony of W. Douglas Blackburn [DN 142]; (5) Allied's Motion to Exclude or Limit the Expert Testimony of Elizabeth Woodward [DN 145]; and (6) ILA's Motion to Exclude the Opinions of the Defendant's

Damages Experts [DN 146]. ILA has also filed two Motions for Oral Argument [DNs 150, 167]. Fully briefed, the matter is ripe for decision.

## I. BACKGROUND

During the relevant period, ILA was a labor law boutique firm that provided consulting, business, and compliance services to mining industry clients. Attorney David Smith ("Smith") was a co-founder of ILA. (Smith Dep. [DN 149-6] 8-11.) During the same period, Allied was a corporation that was owned by Chester Thomas ("Thomas"). Thomas wanted to acquire certain coal reserves located in western Kentucky, owned by the Pittsburg & Midway Coal Mining Co. ("P&M") and its parent company, Chevron Corp. ("Chevron"). The reserves were known as the Onton Reserves. P&M and Chevron, however, were not willing to sell the Onton Reserves without also selling the idled Sebree Mine and its labor liabilities. (Thomas Decl. [DN 149-8] ¶¶ 3-6; Smith Dep. [DN 144-4] 54-57.) As such, in the fall of 1999, Thomas retained his business lawyer, George "Skip" Stigger ("Stigger"), to begin negotiating with P&M and Chevron over the terms of a potential acquisition. To address the labor liabilities, Thomas engaged Smith and ILA.

It is undisputed that ILA did not prepare a written engagement letter or fee agreement upon accepting the representation. Instead, Thomas and Smith orally agreed that the payment of a fee to ILA would be contingent on the transaction's successful closing. The parties disagree on whether the idea of a percentage fee was proposed by Thomas or Smith. (See Smith Dep. [DN 149-6] 184-85 (indicating that the percentage fee was Thomas' idea); Thomas Dep. [DN 149-9] 274-75 (stating that the percentage fee was Smith's idea).) They also disagree as to when they made their oral fee agreement. (See Smith Dep. [DN 149-6] 184-85 (indicating that it was made before ILA's engagement began in October 1999); Thomas Dep. [DN 149-9] 274-75 (indicating that it was made around January of 2000).) Regardless, the parties agree that under their oral fee

agreement, ILA's entitlement to the fee depended upon the occurrence of the closing. (See Smith Dep. [DN 149-6] 236-38; 245-49.) Thomas and Smith made this agreement without any input or involvement by Stigger or any other attorney representing Thomas and his company. (See Stigger Dep. [DN 149-10] 133-34 (stating that he first learned that Thomas and Smith had agreed to a fee agreement involving a five percent interest during a conversation with Thomas).)

Between October of 1999 and May of 2000, Smith spent a substantial amount of time and effort providing Thomas with advice relating to the federal labor law aspects of the transaction. (Smith Dep. [DN 144-4] 388-90; George Oliver Dep. [DN 144-6] 43-44 (stating that spending 600 hours on a project is a significant time); Stigger Dep. [DN 144-5] 58 (noting that "if [the deal] were a baby, it would have been a breech birth," as it was "a tough series of negotiations").) On May 12, 2000, two separate Asset Purchase Agreements were finalized and signed: under one, a newly formed corporation that Thomas owned and controlled called Cochise Coal Co. ("Cochise") acquired the idled Sebree Mine from P&M; under the second, Allied acquired the Onton Reserves from Chevron. (Asset Purchase Agreements [DNs 144-8, 144-9].) Thereafter, Smith and Thomas began the process of negotiating and drafting a written compensation agreement regarding the percentage fee that they had previously discussed.

Stigger represented Allied and Thomas in negotiating the terms of the written agreement. (Mem. in Supp. of ILA's Mot. for Partial Summ. J. ("ILA's Mem.") [DN 144] 6; Mem. in Supp. of Def.'s Mot. for Summ. J. ("Allied's Mem.") [DN 149-1] 8.) On July 17, 2000, Stigger sent a draft to ILA, entitled "Limited Net Profits Interest Agreement." He proposed that ILA would obtain an "ownership of and entitlement to a limited undivided five percent (5%) of the net profits realized by Allied . . . in the ownership, operation and/or sale of" the Onton Reserves. (Draft Agr. [DN 144-10].) Over the next seven months, Stigger negotiated the agreement's terms

with Douglas McDonald ("McDonald"), who represented Smith and ILA. (Smith Dep. [DN 144-4] 234, 238; Thomas Dep. [DN 144-2] 354, 358.) Over the course of the negotiation, the parties shifted concepts—from "net profits" to "net operating income" to "distributions." On February 8, 2001, both ILA and Allied signed the Compensation Agreement.

The finalized and executed Compensation Agreement states, in pertinent part, as follows:

> Payments. Allied shall pay to ILA an amount in cash equal to five percent (5%) of the value of any Distribution (as defined below) at such time as any such Distribution is paid. . . .
>
> As used herein, the term "**Distribution**" means any dividend, payment or distribution of cash, securities or other tangible or intangible property to any holder of capital stock of Allied ("**Allied Stockholder**") or to any Affiliate (defined below) . . . provided that in no event shall (i) a payment or distribution to any Allied Stockholder or any Affiliate in an arms-length transaction in which Allied receives fair market consideration for such payment or distribution, or (ii) any payment to Chester Thomas as reasonable salary for services provided to Allied be deemed to be a Distribution.
>
> As used herein, the term "**Affiliate**" means any of (i) a director, officer, stockholder holding 5% or more of the capital stock (on a fully diluted basis) of Allied, (ii) the spouse, parent, lineal descendant or adopted children of a person who is an individual or a person who is an Affiliate of Allied by virtue of clause (i), or (iii) any other person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, Allied.

(Comp. Agr. [DN 144-1] 1-2 (emphasis in original).) The Compensation Agreement also states that both parties "agree that the compensation . . . is fair, reasonable, and adequate consideration for the services provided by ILA in connection with Allied's purchase of the Onton Reserves." (Id. at 1.) In the complaint filed in this action, ILA alleges that while certain Distributions were paid, Allied failed to compensate it. (Compl. [DN 1] ¶¶ 11, 13, 16-17.) The parties have now filed cross-summary judgment motions concerning the Compensation Agreement's enforceability and meaning.[1] The parties have also filed motions to exclude or limit proffered expert testimony.

---

[1] The Court will address additional material facts as they become relevant to the discussion.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." <u>Anderson</u>, 477 U.S. at 252.

In considering a summary judgment motion, the Court must remain cognizant of the role that expert testimony plays. In this regard, Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the judge acts as a gatekeeper to ensure that expert testimony is reliable and relevant. Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)). In deciding whether testimony is reliable, a court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993).

In Daubert, the Supreme Court identified a non-exhaustive list of factors that may assist a court in assessing the reliability of a proposed expert's opinion. The factors include: (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" in a "relevant scientific community." 509 U.S. at 592–94. This gatekeeping role is not limited to expert testimony based on scientific knowledge, but instead extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702. Kumho Tire, 526 U.S. at 147. Whether a court applies the Daubert factors to assess the reliability of an expert's testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150. Any weakness in the underlying factual basis bears on the weight, as opposed to the admissibility, of the evidence. In re Scrap Metal Antitrust Litigation, 527 F.3d 517, 530 (6th Cir. 2008).

### III. DISCUSSION

In its summary judgment motion, ILA first argues that the record in this case shows that the Compensation Agreement is valid and enforceable. (ILA's Mem. [DN 144] 16-25.) ILA also argues that as a matter of law, it is entitled to a judgment that: (1) Allied is liable for breaching the Compensation Agreement; (2) Allied owes ILA 5% of, at least, $45,130,515 in Distributions (i.e. $2,256,525), plus interest compounded annually at the statutory rate of 8%; and (3) Allied cannot

offset its liability to ILA through a malpractice claim. (See id. at 25-40; see also ILA's Mot. for Partial Summ. J. [DN 141] 1.) In its summary judgment motion, by contrast, Allied argues that the record shows that the Compensation Agreement is invalid and unenforceable. (See Allied's Mem. [DN 149-1] 13-37.) The Court will consider each of the parties' arguments, in turn.

### A. COMPENSATION AGREEMENT'S VALIDITY AND ENFORCEABILITY

The parties' dispute regarding the Compensation Agreement's validity and enforceability concerns whether or not "ILA's claim is barred because the Letter Agreement was entered into in violation of the Rules of Professional Conduct in effect in the time . . . , and the public policy of the Commonwealth of Kentucky, thus rendering the Letter Agreement void and unenforceable." (1st Am. Ans., Aff. Defenses & Countercl. [DN 62] ¶ 22.) Whether a contract is enforceable is a question of law for the Court. Likewise, an attorney's obligations under the Rules of Professional Conduct raise questions of law. See Bertelsen v. Harris, 537 F.3d 1047, 1056 (9th Cir. 2008) (noting that "[w]hether an attorney's conduct violates a rule of professional conduct is a question of law"); Ky. Bar Ass'n v. Thornton, 392 S.W.3d 399, 407 (Ky. 2013) (noting that the Board of Governors' fact findings are "advisory only," and further noting that Kentucky's Supreme Court will conduct a "de novo consideration of pleadings and trial review").

As a general rule, "[c]ourts may void contracts that violate law or public policy." Martello v. Santana, 713 F.3d 309, 313 (6th Cir. 2013) (citing Smith v. The Ferncliff, 306 U.S. 444, 450 (1939)). ILA argues that Kentucky law is unclear as to "whether the Rules of Professional Conduct governing lawyers provide a basis to discern 'public policy' for [the] purposes of determining the enforceability of contracts." (ILA's Mem. [DN 144] 18.) ILA cites a Maryland state-court case, Post v. Bregman, 707 A.2d 806 (Md. 1998), for the proposition that there is a significant split of authority regarding this issue. The Court finds, however, that the Rules of Professional Conduct

do provide a basis to discern public policy. In <u>Bregman</u>, the court made such a holding.[2] Also, in <u>Martello v. Santana</u>, the Sixth Circuit held that the "Kentucky Rules of Professional Conduct are public policy set by the Kentucky Supreme Court." 713 F.3d at 313.

In <u>Martello</u>, the Sixth Circuit recognized that the Rules of Professional Conduct "are not created only for the private benefit of the legal community," but are also meant "to ensure [that attorneys] properly represent their clients, the public." <u>Id.</u> at 313-14 (internal quotation marks and citations omitted). Therefore, the Court finds that courts applying Kentucky law will not enforce an attorney's fee agreement that violates the Rules of Professional Conduct. <u>See id.</u> (affirming <u>Martello v. Santana</u>, 874 F. Supp. 2d 658 (E.D. Ky. 2012), which voided a fee-sharing agreement barred by the Rules of Professional Conduct); <u>Ky. Bar Ass'n v. Womack</u>, 269 S.W.3d 409, 410-11 (Ky. 2008) (treating an unwritten contingency fee agreement as a nullity). Courts in other states have similarly refused to enforce contracts that violate their Rules of Professional Conduct. <u>See</u> <u>Petit-Clair v. Nelson</u>, 782 A.2d 960, 962-63 (N.J. 2001) (invalidating a mortgage because of an attorney's failure to comply with Rule 1.8); <u>McLaughlin v. Amirsaleh</u>, 844 N.E.2d 1105, 1111 (Mass. App. 2006) (refusing to recognize a mortgage obtained in violation of the ethical rules).

ILA argues that this analysis is incorrect, as the Kentucky Court of Appeals has cautioned that the Rules of Professional Conduct "are not designed to be a basis for civil liability." <u>Rose v. Winters, Yonker & Rousselle, P.S.C.</u>, 391 S.W.3d 871, 874 (Ky. Ct. App. 2012). In <u>Rose</u>, the Court declined to recognize a new cause of action against an attorney based on an alleged violation of the ethical rules restricting attorney advertising. In so doing, the Court noted that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under

---

[2] The Court notes that while <u>Bregman</u> held out the possibility that certain fee-splitting arrangements may not be held unenforceable in Maryland for "merely technical, incidental or insubstantial rule violations," 707 A.2d at 819, the Court agrees with Allied that the alleged violations in this case go to the heart of an attorney's fiduciary duties.

the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule." Id. (internal citation omitted). The Court finds, however, that Rose is off-point. It did nothing to overturn the principle that courts will not enforce contracts that violate public policy. Also, it did nothing to question that the Rules of Professional Conduct may reflect Kentucky's public policy in proper circumstances. Thus, this Court concludes that contracts that violate the Rules of Professional Conduct are unenforceable.

In this case, the Rule of Professional Conduct at issue is Rule 1.8(a), which applies when an attorney acquires an ownership interest in a client's business. Ky. Sup. Ct. Rule 3.130(1.8)(a). Allied argues that the undisputed record shows that ILA entered into the Compensation Agreement in violation of Rule 1.8(a). ILA, by contrast, argues that the undisputed record shows that it satisfied the requirements of Rule 1.8(a). During the relevant time period, Rule 1.8(a) stated:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> (3) The client consents in writing thereto.

Ky. Sup. Ct. Rule 3.130(1.8)(a).[3] Thus, Rule 1.8(a) imposes three distinct requirements on an attorney who acquires an ownership interest in a client's business. The Court considers each in turn.

---

[3] The Court notes that Rule 1.8(a) was amended in 2009. However, the principles therein are essentially unchanged. The parties' experts agree on this point. (William Hodes Report [DN 149-2] 13-14; William Fortune Dep. [DN 149-3] 82; Leslie Haley Dep. [DN 149-13] 90.)

**Rule 1.8(a)(1).** Rule 1.8(a)(1) states that the "transaction and terms on which the lawyer acquires the interest" must be "fair and reasonable to the client," "fully disclosed," and "transmitted in writing to the client in a manner which can be reasonably understood by the client." Id. The parties dispute whether Smith "fully disclosed" the transaction and terms on which he acquired the interest. The parties also dispute whether the transaction and terms are "fair and reasonable."

*Full Disclosure.* In its summary judgment motion, ILA argues that there is no genuine dispute that the Compensation Agreement's terms were not only fully disclosed and transmitted in writing, but also were extensively negotiated over a seven-month period between July of 2000 and February of 2001. (ILA's Mem. [DN 144] 20.) In this respect, ILA notes that the executed Compensation Agreement was reached only after multiple drafts had been exchanged between its counsel and Allied's counsel. These drafts allowed the parties to resolve the mechanism that they would use to calculate the 5% fee. (See ILA's Opp. to Allied's Mot. for Summ. J. [DN 159] 12.)

Allied argues that Rule 1.8(a)(1)'s "full disclosure" requirement calls for more than a written fee agreement. Allied states that instead, Rule 1.8(a)(1) requires an acquiring lawyer to disclose all the material risks and disadvantages of a proposed contract, as well as any reasonable alternatives thereto. (Allied's Mem. [DN 149-1] 24-30.) Allied cites the ABA's Formal Ethics Opinion 00-418 (July 7, 2000) in support of its position. That opinion states that a "good faith effort to explain in understandable language the important features of the particular arrangement and its material consequences as far as reasonably can be ascertained at the time of the [contract] should satisfy the full disclosure requirements of Rule 1.8(a)." ABA Formal Ethics Op. 00-418, 7 (July 7, 2000). Allied also cites cases from other jurisdictions that have discussed the disclosure requirement. See, e.g., People v. Barbieri, 61 P.3d 488, 491 (Co. 2000) ("Full disclosure . . . requires a clear explanation of the differing interests of the lawyer and client, the advantages of

seeking independent advice, and a detailed explanation of the risks and disadvantages to the client entailed in the business agreement."). Further, Allied relies on Comment 2 of the current version of Rule 1.8(a) for the proposition that "full disclosure requires discussion of [the] risks of [the] transaction, including risks presented by [the] lawyer's involvement and reasonable alternatives to the transaction." (Allied's Mem. [DN 149-1] 17.) Allied states that ILA and Smith simply did not make the requisite disclosures. According to Allied, Smith had an obligation to disclose to Thomas that no binding oral agreement existed, that the circumstances surrounding the transaction had materially changed, and that the written agreement would create a conflict with regard to Smith's future representation of Allied. (Id. at 25-27.)

Rule 1.8(a)(1)'s unambiguous terms state only that "[t]he transaction and terms on which the lawyer acquires the interest" must be fully disclosed. In this case, the Court agrees with ILA that there is no genuine dispute as to whether ILA complied with this requirement. As ILA notes, the Compensation Agreement's terms are in writing and were extensively negotiated by the parties' counsel between July of 2000 and February of 2001. Moreover, the final, executed Compensation Agreement was reached only after multiple drafts had been exchanged. The Court finds that under the facts of this case, ILA and Smith's disclosures were sufficient.

To be sure, the ABA's Formal Ethics Opinion 00-418 indicates that an attorney must do more than simply have a written agreement. Instead, it indicates that Rule 1.8(a)(1) requires a "good faith effort to explain in understandable language the important features of the particular arrangement and its material consequences as far as reasonably can be ascertained at the time of the [contract] . . . ." ABA Formal Ethics Op. 00-418, 7 (July 7, 2000). In this case, however, the Court finds that the undisputed facts show that Smith made such a "good faith effort." Even when the facts are construed in the light most favorable Allied, the non-moving party, there can

be no doubt that the agreement's terms (and the material consequences of them) were conveyed to Thomas. In this respect, it simply cannot be overlooked that Thomas had retained Stigger as counsel, and Stigger was advocating for Thomas and Allied, negotiating favorable terms on their behalf. The Court does not believe that the Rule required ILA and Smith to reiterate the details of the contract's terms, and the material consequences of those terms, to Thomas and Allied in light of the parties' negotiations through counsel and their exchange of multiple drafts. Thomas and Allied clearly already knew all pertinent information regarding the agreement's terms. The Court thus finds that ILA and Smith complied with their disclosure obligations under Rule 1.8(a)(1).

The cases cited by Allied are distinguishable from the facts here, as **all** of them involve attorneys who entered into transactions with their clients when the clients were **not** represented by independent counsel. For example, in People v. Barbieri, the client did not have counsel, yet the attorney "failed to fully disclose the terms of the financial arrangements in writing to his client, he failed to advise his client that the use of independent counsel might be advisable, he failed to allow sufficient time for his client to seek out and confer with independent counsel, and he failed to acquire his client's consent to the transaction in writing." 61 P.3d 488, 491 (Co. 2000). The court held that the attorney thus failed to make the requisite disclosures. In such a case, this Court finds that it makes sense that "full disclosure" would require "a clear explanation of the differing interests of the lawyer and client, the advantages of seeking independent advice, and a detailed explanation of the risks and disadvantages to the client entailed in the business agreement." Id. Here, however, retained, independent counsel was actively involved in the contract negotiations. Thus, the Court finds that such detailed disclosure was both redundant and unnecessary. The Rules of Professional Conduct are designed to ensure that unscrupulous lawyers do not over-reach when dealing with clients. Here, there is no evidence of overreaching.

The Court's decision is also supported by Comment 2 to the current version of Rule 1.8(a), which is relied on by Allied. Comment 2 states that Rule 1.8(a)(1) "requires that the transaction itself be fair to the client and that its essential terms be communicated to the client, in writing, in a manner that can be reasonably understood." Ky. Sup. Ct. Rule 3.130(1.8)(a), cmt. 2. Here, there can be no dispute that the Compensation Agreement's essential terms were communicated to Allied, in writing. (Comp. Agr. [DN 144-1].) Comment 2 then states that "**[w]hen necessary**, the lawyer should discuss both the material risks of the proposed transaction, including any risk presented by the lawyer's involvement, and the existence of reasonably available alternatives and should explain why the advice of independent legal counsel is desirable." Ky. Sup. Ct. Rule 3.130 (1.8)(a), cmt. 2 (emphasis added). Here, the Court finds that based on the facts in this record, any such disclosure was **not** necessary. Thomas and Allied had independent legal counsel, Stigger. Further, the facts show that Stigger negotiated with McDonald to find an appropriate method by which to calculate a percentage fee, addressing material risks of the transaction along the way. One only has to analyze the extensive negotiations between Stigger and McDonald to be assured that the transaction's perceived risks were addressed and discussed. (See, e.g., Nov. 14, 2000 Ltr. from Stigger to McDonald [DN 159-3] ¶ 2 (noting that Thomas had "no interest in expanding the net profits interest along the lines suggested," rejecting ILA's proposed "net operating income" approach, and advocating for his prior "net profits" proposal); Jan. 3, 2001 Fax from Stigger to McDonald [DN 159-6] 1 (opposing the dispute resolution process set forth in ILA's draft, and noting that a provision mandating such a process was "not acceptable" to Thomas).)

Moreover, the Court finds that an analysis of Stigger's deposition testimony reveals that Stigger not only addressed the material risks of the transaction with Thomas, but he also tried to discuss with Thomas the risks presented by Smith's involvement in Thomas' business. Notably,

when asked whether he "raised with [Thomas] the notion that [he] could go back and negotiate a deal or try to do a different deal with [Smith]," Stigger did not state that he failed to do so. Instead, he answered: "I got cut off at that." (Stigger Dep. [DN 159-10] 140.) Stigger then explained:

> I don't get on a soapbox real often, but I did on that. And the reason for it is I had a law partner who got involved in doing deals with clients and got involved in clients' businesses and I saw just how God awful it could work out. And this would have been in the oil and gas business and I just – I didn't like any part of it.
> And when I talked to [Thomas] I tried to counsel him on that. He said, back off, I've already agreed to it, or words to that effect. And so that's how that got started.

(Id. at 134-35.) Stigger stated that this conversation "lasted a good 30 minutes," and that during the conversation, he tried to explain to Thomas that he should negotiate a different deal. (Id. at 135.) Stigger stated that he finds that when a "lawyer [is] involved in your business as a business partner or as a stockholder or what have you, then you've got somebody that's going to be an officious, an officious intermeddler in whatever you're doing, and you don't want to have to run your business so as to please the lawyer." (Id.) Stigger stated that he "tried [his] best" to explain his concerns to Thomas about a lawyer working himself into an equity position, but Thomas "cut [him] off at the pass." (Id. at 135-36.) Therefore, the Court finds that Thomas was advised by his independent counsel of the potential risks associated with entering a percentage fee agreement with Smith. Further, Thomas had the opportunity to explore that advice, and explore whether or not there were grounds to void the oral agreement. The Court finds that the fact that Thomas chose to ignore the advice, cut Stigger off with respect to it, and honor the oral agreement with Smith was his own decision and prerogative. The facts support the Court's conclusion that as a matter of law, sufficient disclosures were made about the transaction and the Compensation Agreement's terms under Rule 1.8(a)(1). Under the circumstances, it was simply unnecessary for

Smith to make any additional disclosures. This conclusion, however, does not end the analysis. Rule 1.8(a)(1) also requires the transaction and its terms to be "fair and reasonable" to Allied.

*Fair and Reasonable.* "Fairness is determined based on facts that reasonably could be known at the time of the transaction, not as the facts later developed." Restatement (3d) Law Governing Lawyers § 126 cmt. E. In its summary judgment motion, ILA argues that there can be no genuine dispute that the Compensation Agreement's terms were fair and reasonable to Allied, as Allied acknowledged in writing, at the time it executed the Compensation Agreement, that the terms were "fair, reasonable and adequate consideration for the services provided by ILA in connection with Allied's purchase of the Onton Reserves." (Comp. Agr. [DN 144-1] 1.) As ILA notes, that acknowledgement was made **after** Thomas had completed the acquisition of the Onton Reserves and the Sebree Mine. ILA argues that both Thomas and Stigger thus knew the extent of the work ILA performed with respect to those transactions—and perceived the agreement as fair.

In its summary judgment motion, Allied argues that the Compensation Agreement's terms were not fair and reasonable to it. Allied discusses this issue in terms of disclosures Smith allegedly was obligated to make under Rule 1.8(a)(1)—i.e. Smith was required to disclose that no binding oral contract existed, that the circumstances surrounding the transaction had changed, and that the written fee agreement would create a conflict regarding his representation of Allied in the future. (Allied's Mem. [DN 149-1] 25-27.) But the Court reiterates its finding that under the facts of this case, Smith was not obligated to make such disclosures; they were unnecessary in light of the fact that Thomas had retained counsel, Stigger, who could (and did) advise him about the transaction, its terms, and the disadvantages of entering into such an arrangement. Nevertheless, the Court finds that some of these circumstances are still relevant to Rule 1.8(a)(1), as they go toward the agreement's fairness and reasonableness.

As to this issue, Allied argues that the written agreement was neither fair nor reasonable to it because the undisputed record shows that Smith never informed Thomas that the oral fee agreement was not binding, thus allowing him to enter into negotiations operating under the misconception that the oral agreement was enforceable. Allied argues that the facts show that Smith acted as if the discussions about the written agreement pertained to "nothing more than the recording of an already enforceable contract." (Allied's Mem. [DN 149-1] 25 (citing Smith Dep. [DN 149-6] 184-85, 218-20) (confirming Smith's belief that the oral compensation agreement meant that they "had a deal" and that Thomas "shouldn't have" changed his mind in light of this deal).) Allied argues that if Thomas and Stigger had understood that no binding oral agreement existed, and understood that they could thus reevaluate the fee arrangement, Stigger "may well have investigated possibilities other than offering ILA an interest in Allied." (Id. at 25-26.)

Allied notes that all the parties, including Thomas, Stigger, Smith, and McDonald, agree that Smith and Thomas reached what they viewed as a binding fee agreement, before Stigger and McDonald began drafting the written agreement's terms. (McDonald Dep. [DN 149-12] 26, 61-62, 93-94; Smith Dep. [DN 149-6] 184-85, 218-20; Stigger Dep. [DN 149-10] 207-09; Thomas Dep. [DN 149-9] 366-67.) Further, even ILA's expert agrees that Smith failed to comply with his Rule 1.8(a) obligations as to the oral agreement. (See William Fortune Dep. [DN 149-3] 47-48.) Allied argues that by violating Rule 1.8(a) as to the oral agreement, Smith "left Thomas with the impression that the parties had reached a binding agreement," and when the parties began negotiating the written agreement's terms, he should have "explain[ed] the legal ramifications of the fee agreement in addition to the other circumstances which could reasonably be expected to influence Thomas' decision." (Allied's Mem. [DN 149-1] 20.) Allied argues that due to Thomas' misconception about the oral agreement's validity, he "limited Stigger's role to memorializing

the deal which Thomas and Smith had already reached." (Id. at 21-22.)[4] In sum, Allied argues that if Smith had complied with his ethical obligations regarding the oral agreement, then the agreement would have been "fair and reasonable" to it, as Thomas "could have engaged Stigger to analyze the requirements, risks and advantages of this type of arrangement as opposed to a more traditional hourly fee engagement." (Id. at 23.)

Allied further argues that the written agreement was not fair and reasonable to it because by the time the parties began negotiating the written agreement, the circumstances had materially changed from the time the oral agreement was entered. (Id. at 26.) Allied states that by the time the written agreement was proposed, the acquisition of the Onton Reserves had closed, the parties had entered into an hourly fee arrangement for future work, and Smith knew how much time he had put into the engagement. Allied argues that the risk underlying the prior oral agreement—namely, that Allied's closing with respect to the Onton Reserves would not occur—had thus been eliminated. In other words, Allied states that if the 5% fee originally contemplated by the parties had been designed to compensate Smith for taking on the risk of non-payment (in the event that the Onton Reserves transaction did not successfully close), then it makes no sense to carry forward this same figure, without examination, to the new negotiation. (See id. at 26-27.)

The Court finds that when the facts are construed in the light most favorable to Allied, as the non-moving party with respect to ILA's summary judgment motion—and when the facts are construed in the light most favorable to ILA, as the non-moving party with respect to Allied's summary judgment motion—a genuine factual issue exists regarding whether the transaction was "fair and reasonable" to Allied. Under Rule 1.8(a), when assessing fairness and reasonableness,

---

[4] Along these same lines, Allied highlights that when Stigger expressed his reservations to Thomas about entering into such a business transaction with Smith, Thomas told him that the deal was already done. (See Stigger Dep. [DN 149-10] 145 (stating he "represented [Thomas] in doing the document"); 202 (stating he "wasn't involved in the nuts and bolts of [the agreement]" but he was "involved in trying to put on paper what the agreement was"); 223-26 (stating that his role was "just to put on paper what [Thomas] had agreed to," "not to negotiate different terms," as Thomas had already reached an agreement with Smith).)

the factors of Rule 1.5, which generally require a lawyer's fee to be "reasonable," are relevant. ABA Formal Ethics Op. 00-418, 7 (July 7, 2000). The factors in Rule 1.5 include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. Ky. Sup. Ct. Rule 3.130(1.5).

The Court finds that when the evidence is construed in the light most favorable to ILA, a reasonable jury could find that these factors support a finding that the transaction was fair and reasonable to Allied. All of the parties agree that the representation involved questions of federal labor law liabilities, which are specialized and complex. Also, Smith and ILA brought industry and subject-matter experience to the transaction. The parties also seem to agree that due to the idled Sebree Mine, potentially large labor liabilities were involved. Finally, the Compensation Agreement clearly states that the parties deemed its terms to be "fair, reasonable and adequate consideration for the services provided by ILA . . . ." (Comp. Agr. [DN 144-1] 1).

However, when the evidence is construed in the light most favorable to Allied, that same reasonable jury could also find that the listed factors support a finding that the transaction was not fair or reasonable to Allied. While the contingent nature of a transaction ordinarily supports a reasonableness finding, the facts show that by the time the parties were negotiating the terms of the written agreement, Allied's transaction had already closed. Because the Onton Reserves had been purchased and Smith knew at that point how many hours he had spent on the transaction, a

jury could find that the risk was no longer as high for ILA and that a 5% percentage fee was unreasonable.[5] Moreover, the parties' experts agree that Smith violated Rule 1.8 when he entered into the oral agreement with Thomas. (William Fortune Dep. [DN 149-3] 33-34, 39-40 (noting that entering into the oral agreement violated Smith's ethical obligations).) The Court finds that in light of the previous ethical violation, there is a factual issue as to whether Thomas entered the parties' negotiations based on some misunderstanding that he was obligated to enter a percentage fee contract with ILA—and, in turn, whether this misunderstanding caused the agreement to be unreasonable or unfair.[6] In sum, the issue of fairness and reasonableness will remain for the jury.

**Rule 1.8(a)(2).** Rule 1.8(a)(2) states that the client—Allied—must be "given a reasonable opportunity to seek the advice of independent counsel in the transaction." See Ky. Sup. Ct. Rule 3.130(1.8)(a)(2). In its summary judgment motion, ILA argues that here, there can be no genuine dispute that it complied with this requirement, as Allied was not only given a reasonable opportunity to seek the advice of independent counsel, but it availed itself of that opportunity by retaining Stigger to negotiate the Compensation Agreement's terms. (ILA's Mem. [DN 144] 21.)

Allied agrees with ILA that "Allied was given the opportunity—and did indeed—consult Stigger in the negotiations over the written fee agreement . . . ." (Allied's Mem. in Resp. & Opp. to ILA's Mot. [DN 164] 20.) Allied notes, however, that Smith reached his prior oral agreement with Thomas without giving him an opportunity to consult with Stigger. In addition, Allied notes that due to Thomas' misunderstanding of the oral agreement's binding effect, Thomas limited Stigger's job to merely documenting the oral agreement. Allied argues that genuine issues of fact

---

[5] The Court notes that whether the closing of the Onton Reserves eliminated the risk is somewhat in dispute, as ILA argues that "significant issues" remained regarding the acquisition (because Thomas asked P&M for an extension of time to pay and there was a risk Allied would not successfully develop and mine the Onton Reserves).

[6] The Court notes that Stigger's testimony indicates that Thomas knew he could attempt to get out of the deal, but chose not to—as Thomas told Stigger that if he tried to get out of the deal, he would "never see the light of day," as Smith would "sic the union right on [him]." (Stigger Dep. [DN 159-10] 136-37.) There is thus a genuine factual dispute as to whether there was any sort of misunderstanding on Thomas' part.

thus remain on whether Allied was given a reasonable opportunity to consult independent counsel within the meaning of Rule 1.8(a)(2). Also, Allied argues in its summary judgment motion that based on the record, the Court should find Stigger's involvement to be insufficient, as he did not perform the typical functions of independent counsel. (Allied's Mem. [DN 149-1] 30-31.)

The Court disagrees with Allied. In this case, there can be no doubt that with respect to the **written** agreement at issue, Allied was "given a reasonable opportunity to seek the advice of independent counsel." While Allied focuses on Smith's prior ethical violation of Rule 1.8(a)(2) regarding the **oral** fee agreement, that agreement is not at issue here. As to the **written** agreement, it is clear that Thomas was given the opportunity—and did indeed—consult with Stigger. Allied concedes as much. As noted in Comment 4 to the current version of Rule 1.8(a), representation of the client by another lawyer renders inapplicable subsection (2) of the Rule relating to the opportunity to consult independent counsel. See Ky. Sup. Ct. Rule 3.130(1.8), cmt. 4. Therefore, as a matter of law, the Court finds that Smith and ILA did not violate Rule 1.8(a)(2).

At this juncture, the Court notes that in its briefs, Allied argues that Smith's failures to give Allied the "disclosures mandated by Rule 1.8(a)(1)" are not excused by Stigger's actions in crafting the written fee agreement. Allied argues that Rule 1.8(a) places the obligation of full disclosure on the lawyer acquiring the interest—here, Smith, not Stigger. (Allied's Mem. [DN 149-1] 30-31.) Allied cites the Restatement (3d) of the Law Governing Lawyers § 126 (2000) in support of its position, which has a similar structure to Rule 1.8(a). A reporter's note to comment D to § 126 specifically notes that "representation of the client by independent counsel will not itself suffice to satisfy a contracting lawyer's disclosure obligation." In addition, Allied cites the commentary to the current version of Rule 1.8(a). It states that the representation of the client by another lawyer renders inapplicable subsection (2) of the Rule. See Ky. Sup. Ct. Rule 3.130(1.8),

cmt. 4. But the comment does not provide that the sections relating to disclosure and consent are superseded. Allied argues that Smith thus had an obligation "to put the necessary information in the hands of the independent attorney [Stigger] . . . ." (Allied's Mem. [DN 149-1] 32.) But the Court finds that under the facts of this case, while subsections (1) and (3) were not superseded, it was unnecessary for Smith to make any disclosures other than those he made during the parties' negotiations concerning the written Compensation Agreement. The Court reiterates its finding that Smith and ILA complied with Rule 1.8(a)(1) as to their disclosure obligations.

**Rule 1.8(a)(3).** Rule 1.8(a)(3) states that a lawyer shall not knowingly acquire an interest in a client's business unless the "client consents in writing thereto." Ky. Sup. Ct. Rule 3.130(1.8)(a)(3). In its summary judgment motion, ILA argues that there is no genuine dispute that Allied consented in writing to the Compensation Agreement's terms, as its representative signed it on February 8, 2001. (See ILA's Mem. [DN 144] 20-21.) Allied argues that genuine issues of fact remain as to whether it consented in writing within the meaning of Rule 1.8(a)(3). Allied argues that Rule 1.8(a)(3) requires **informed** written consent, as indicated by the fact that the current version of the Rule expressly so states—and by the fact that the parties have agreed that the prior version of Rule 1.8(a) imposed substantially identical requirements as the current version. Allied argues that here, the failure of ILA to disclose that the oral fee agreement was not effective and binding, and Allied's resulting misapprehensions, raise genuine issues of material fact regarding the sufficiency of Allied's consent. (Allied's Mem. in Resp. & Opp. to ILA's Mot. [DN 164] 21.)

The Court disagrees with Allied. In this case, there can be no doubt that Allied consented in writing to grant ILA an interest in Allied's business. As a matter of law, Smith did not violate Rule 1.8(a)(3). The Court finds that Allied's arguments regarding the validity of its consent are, again, arguments concerning the fairness and reasonableness of the Compensation Agreement.

By authorizing its representative to sign the Compensation Agreement, Allied clearly consented to it. Allied's consent was also "informed," as the terms were agreed upon only after a seven-month negotiation process, where both of the involved parties were represented by counsel. No genuine issues of material fact remain regarding Allied's Rule 1.8(a)(3) consent.

**Summary on Rule 1.8(a).** In sum, the Court finds that genuine issues of fact remain as to whether the Compensation Agreement's terms, and the transaction, were "fair and reasonable" to Allied. Thus, as to these issues—and as to whether ILA and Smith violated Rule 1.8(a)(1)—the Court finds that ILA's summary judgment motion [DN 141] and Allied's summary judgment motion [DN 149] are **DENIED**. As to whether ILA and Smith violated Rule 1.8(a)(2) and Rule 1.8(a)(3), ILA's motion [DN 141] is **GRANTED** and Allied's motion [DN 149] is **DENIED**.

As a separate but related matter, Allied contends that the Compensation Agreement should be declared unenforceable because the agreement would reward the "unauthorized practice of law." In its summary judgment motion, ILA argues that it should be granted judgment on this issue. According to ILA, the facts show that when Thomas retained ILA in connection with his desire to acquire the Sebree Mine and the Onton Reserves, Thomas was already represented by Stigger, who was located in, and licensed to practice in, Kentucky. ILA states that Smith and ILA only advised and negotiated on the federal labor law issues. Stigger, by contrast, worked on the other aspects of the transaction. Stigger stated in his deposition that he "was in charge of the document . . . and [Smith] was going to handle the labor law provisions . . . ." (Stigger Dep. [DN 144-5] 57.) ILA states that under these facts, there is no basis to conclude that ILA and Smith engaged in the unauthorized practice of law—or to void the Compensation Agreement based on the fact that Smith was not a member of Kentucky's bar. (See ILA's Mem. [DN 144] 24-25.)

In support of its position, ILA argues that working on a transaction centered in a state other than where an attorney is admitted does not amount to the unauthorized practice of law, especially where the legal issues handled are primarily federal in nature. ILA cites comment E to § 3 of the Restatement (3d) of the Law Governing Lawyers. It states that "a lawyer conducting activities in the lawyer's home state may advise a client about the law of another state, a proceeding there, or a transaction there, including conducting research in the law of the other state, advising the client about the application of that law, and drafting legal documents intended to have legal effect there." ILA states that in light of this rule, even if Smith had been advising as to Kentucky law, his practice would have been acceptable. (ILA's Mem. [DN 144] 24-25.)

Allied counters that ILA engaged in the unauthorized practice of law in Kentucky. Allied cites the proffered testimony of its expert, Peter Ostermiller, in support of its position. Ostermiller opines that the type of activities undertaken by Smith in his representation would be viewed as the "practice of law" in Kentucky under the rules in effect at that time. (Ostermiller Report [DN 164-41] 17-20.) According to Ostermiller, at the relevant time, Kentucky had a restrictive view of cross-border practice, as its Rules stated only that lawyers shall not practice "in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction." Ky. Sup. Ct. Rule 3.130(5.5). Allied states that the Restatement cited by ILA is thus inapplicable, as it corresponds to the modern, more permissive approach. Further, Allied notes that until 2009, Kentucky's Rules of Professional Conduct did not address cross-border practice at all, and when the state modified Supreme Court Rule 3.130(5.5), it retained the requirement that services must arise out of, or relate to, the lawyer's practice in a jurisdiction where the lawyer is authorized to practice. Ky. Bar Ass'n Ethics 2000 Comm'n Report, 5-21 (Nov. 16, 2006). Allied states that here, rather than being incidental to his Virginia practice, Smith's activities in Kentucky comprised

the predominant part of his representation of Allied. Allied states that because Smith undertook to advise Allied regarding the drafting of a Kentucky contract, concerning Kentucky real estate, and applying Kentucky law, this opinion has a reasonable basis, and ILA should not be granted summary judgment on the issue. (Allied's Mem. in Resp. & Opp. to ILA's Mot. [DN 164] 23-24.)

The Court finds that the record establishes that Smith did not engage in the unauthorized practice of law in Kentucky. The basis for Allied's argument, and Ostermiller's opinion, is that Smith was unauthorized to advise Allied on "the drafting of a Kentucky contract, concerning Kentucky real estate, and applying Kentucky law . . . ." (Id. at 24.) But the Court finds that Smith was authorized to act as he did. Allied's argument overlooks that Smith's advice was limited to **federal** labor law issues, which certainly related to his practice in Virginia. It was Stigger—not Smith—who worked on all other aspects of the transaction. It is a common practice among transactional attorneys to advise clients in other states as to the federal implications of contract language. Thus, the Court finds that ILA's summary judgment motion [DN 141] is **GRANTED** on this issue. As a matter of law, ILA and Smith did not engage in the unauthorized practice of law. The Compensation Agreement will not be deemed unenforceable on such grounds.

Finally, assuming that the jury finds the Compensation Agreement's terms to be "fair and reasonable" to Allied under Rule 1.8(a)(1), such that the agreement is deemed both valid and enforceable, the Court agrees with ILA that Allied breached the agreement. The Compensation Agreement provides that Allied "**shall pay** to ILA an amount in cash equal to five percent (5%) of the value of any Distribution **at such time as any Distribution is made**." (Comp. Agr. [DN 144-1].) Here, there is no genuine dispute that Allied made Distributions which were subject to the Compensation Agreement but then failed, refused, or neglected to pay ILA cash equal to five percent of those Distributions at the time such Distributions were made. As ILA notes, Allied's

accounting expert, Terry Walker, has conceded that since December 31, 2007, Allied has made Distributions totaling $1,563,876 that were subject to the Compensation Agreement. (Terry Walker Dep. [DN 144-16] 95.) In light of this admission that at least some Distributions were subject to the Compensation Agreement, and in light of Allied's undisputed failure to pay ILA five percent of those Distributions at the time they were made, Allied would be liable as a matter of law for breaching the Compensation Agreement (if the jury were to find it valid). Of course, if the jury were to find the Compensation Agreement to be unfair or unreasonable to Allied, then the Compensation Agreement would be void and there would be no contract to breach.

### B. ILA's Motion to Exclude the Opinions of Peter Ostermiller, Esq. [DN 138]

Peter Ostermiller is an attorney whom Allied has retained to offer his opinions "regarding certain ethical and professional responsibility liabilities and duties of David S. Smith concerning Chester Thomas and Allied Resources, Inc." (Ostermiller Rep. [DN 138-2] 1.) Ostermiller has practiced law in Kentucky for over 30 years, and for nearly 25 years, he has been involved in matters concerning attorney and judicial ethics. He concentrates his practice on professional responsibility and legal ethics matters, primarily in malpractice litigation and attorney disciplinary proceedings. (Id. at 2; Curriculum Vitae, id. at 22-23.) In this case, Allied asked for Ostermiller's opinion on: (1) whether Smith committed the unauthorized practice of law in Kentucky when he advised Thomas in connection with the acquisition of the Onton Reserves and the Sebree Mine; and (2) whether Smith violated the "applicable standard of care" as to negotiating, drafting, or reviewing particular terms contained in § 2.7.5 of the Asset Purchase Agreement between P&M and Cochise, which became the subject of this Court's December 18, 2003 opinion in Cochise Coal Co., Inc. d/b/a Coal Properties Trading Co. v. The Pittsburg & Midway Coal Mining Co., No. 4:01-CV-128. (Id. at 1-2.) ILA argues that these opinions must be excluded.

**Opinion on Unauthorized Practice of Law.** The Court does not question Ostermiller's knowledge and experience as to the Kentucky Rules of Professional Conduct. However, the Court has held that as a matter of law, Smith did not engage in the unauthorized practice of law by advising Allied on federal labor law issues. Thus, Ostermiller's opinion on the issue is unnecessary and inadmissible. While Allied is correct that certain testimony from legal experts on applying the Rules of Professional Conduct to an assumed set of facts might help guide the jury as to the relevant standard of care, and thus be admissible expert testimony, see Innes v. Howell Corp., 76 F.3d 702, 711 (6th Cir. 1996) ("The case law makes clear that the purpose of expert testimony is to guide the jury as to the relevant standard of care in the profession, based on rules and codes of professional responsibility."), the jury here will not be asked whether Smith engaged in the unauthorized practice of law. Thus, Ostermiller's opinion is **EXCLUDED** and ILA's motion [DN 138] is **GRANTED**. There are simply no genuine fact issues concerning the nature of Smith's actions.

**Opinion that ILA violated the Standard of Care.** ILA next argues that Ostermiller is not qualified to opine on the standard of care for negotiating and drafting acquisition contracts, or for advising on federal labor law matters. This argument relates solely to Allied's position that it is entitled to a set-off because ILA and Smith committed legal malpractice for its work on Cochise's acquisition of the Sebree Mine from P&M. As noted below, however, the Court finds that Allied is not entitled to a set-off for alleged malpractice. Accordingly, Ostermiller's opinion on the issue will be unnecessary and is **EXCLUDED**. ILA's motion [DN 138] is **GRANTED**.

### C. ILA'S MOTION TO EXCLUDE THE OPINIONS OF W. WILLIAM HODES, ESQ. [DN 139]

William Hodes is an attorney who holds himself out as an expert witness "on professional ethics and breach of fiduciary duty issues." (Hodes Rep. [DN 139-2] 1.) He taught professional

responsibility and legal ethics for approximately twenty years between 1979 and 1999, and he is a co-author of *The Law of Lawyering*, a leading treatise in the area. (Id. at 2.) He opines that ILA and Smith violated their obligations under the Kentucky Rules of Professional Conduct and the standard of care required of lawyers when they take a stake in their clients' business. He opines that both the oral fee agreement and the written Compensation Agreement are invalid and cannot be enforced. (Id. at 10-26.) ILA argues that these opinions must be excluded, as they are opinions on questions of law. (Mem. in Supp. of Mot. to Exclude Ops. of William Hodes [DN 139-1] 1-2.)

ILA cites Netherlands Ins. Co. v. Lexington Ins. Co., 2013 WL 2120817, at *9 (W.D. Ky. May 15, 2013), in support of its position. There, the plaintiff sought to offer an expert's opinion that there was an enforceable contract between the parties to share the defense costs incurred in connection with a wrongful death case. This Court found that the plaintiff could not properly do so, as the expert "basically analyzed the facts himself (i.e. the language of the email communications [between the parties]) and [drew] a legal conclusion based on his interpretation of these facts (i.e. a contract existed)." Id. at *9. The Court concluded that the expert's opinion was "nothing more than a legal conclusion" and was "unacceptable," as a "trial judge does not need the judgment of witnesses." Id. (quoting United States v. Zipkin, 729 F.2d 384, 387 (6th Cir. 1984)). In this case, ILA argues that Hodes' opinions are of a similar nature, as they are nothing more than legal conclusions. ILA argues that this was confirmed by Hodes' deposition testimony, where he stated that his opinions on the Compensation Agreement's validity and enforceability are based, in part, on judicial decisions that address the question of what "legal effect" a breach of fiduciary duty has on the enforcement of a contract. (See Hodes Dep. [DN 139-3] 50-52.)

Allied counters that Hodes' testimony is proper, as the enforceability of the Compensation Agreement depends on ILA's compliance with applicable professional standards. Allied states

that ILA exaggerates the significance of Hodes' conclusions as to enforceability, as he does not purport to tell the jury what the law is on that subject. Instead, the crux of his opinions go toward whether ILA and Smith adhered to the standard of care applicable when lawyers acquire a stake in their clients' business. (See Allied's Mem. in Resp. & Opp. to ILA's Mot. to Exclude Ops. of Hodes [DN 157] 4-5.) Allied states that Hodes can present his opinion to the jury in a variety of fashions: (1) that the Compensation Agreement is unenforceable due to ILA's failure to adhere to the Kentucky Rules of Professional Conduct; or (2) that ILA failed to adhere to those Rules; or (3) that ILA's conduct was not consistent with the standards of conduct applicable to lawyers acquiring a stake in their clients' business. (See id. at 5-6.) Allied argues that regardless of how the testimony is couched, the substance is plainly admissible in this case.

The Court agrees with Allied. For the jury to decide whether the Compensation Agreement was "fair and reasonable" to Allied under Rule 1.8(a)(1), it will need to consider whether there was a previous ethical violation when the parties made their oral fee agreement such that Thomas entered the parties' negotiations based on a misunderstanding. The jury will also need to consider whether it was fair and reasonable to Allied for the parties to enter into a 5% fee deal in light of the fact that the Onton Reserves had been purchased prior to the parties' written agreement. Hodes' testimony on the standard of care for attorneys under the Rules of Professional Conduct would assist the jury in comprehending and understanding the parties' negotiations. A juror's ordinary experience would not permit him to determine whether a lawyer violated such rules. As such, expert interpretation is desirable. See Middle Market Fin. Corp. v. D'Orazio, 2002 WL 31108260, at *8 (S.D.N.Y. Sept. 23, 2002) ("If an expert is precluded from testifying as to the law applicable to the underlying action, he will not be able to explain the rationale for his opinion and the jury will be left with only the expert's naked conclusion with no basis for

evaluating its validity or persuasiveness."); _In re_ Iron Workers Local 25 Pension Fund, 2011 WL 1256657, at *5 (E.D. Mich. Mar. 31, 2011) (noting that an "expert report is not inadmissible simply because it contains opinions on ultimate issues in the case").

Indeed, as Allied notes, when expert testimony does not address a pure issue of controlling law, but rather explains a legal principle relevant to the case, the testimony should be allowed as assisting, rather than supplanting, the jury's judgment. See United States v. Monus, 128 F.3d 376 (6th Cir. 1997) (where a defendant was convicted of mail fraud, conspiracy, wire fraud, and filing false tax returns, it was not impermissible for an expert to testify on whether certain events would trigger tax liability, as the expert did not determine the defendant's guilt or instruct the jury on controlling legal principles). ILA's motion [DN 139] is accordingly **DENIED**. Importantly, however, the Court will limit Hodes' references to the Compensation Agreement's enforceability, as a contract's enforceability on public policy grounds is a question of law for the Court.

### D. ALLIED'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF WILLIAM FORTUNE AND LESLIE HALEY [DN 140]

William Fortune ("Fortune") teaches legal ethics at the University of Kentucky College of Law. (Fortune Rep. [DN 140-4] 1.) Leslie Haley ("Haley") teaches legal ethics at T.C. Williams School of Law at the University of Richmond. (Haley Rep. [DN 140-5] 1.) Fortune and Haley's testimony addresses Allied's contention that the Compensation Agreement is unenforceable on public policy grounds. Specifically, Fortune and Haley opine that Smith and ILA did not violate Rule 1.8. They emphasize that Allied was separately represented by Stigger in the transaction.

Allied argues that Fortune and Haley's testimony must be excluded, as it based on the erroneous assertion that a lawyer's Rule 1.8(a) disclosure obligations are superseded when the client retains independent counsel. Allied states that the applicable legal authorities are contrary to Fortune and Haley's testimony. (Allied's Mot. to Exclude or Limit the Expert Testimony of

Fortune & Haley [DN 140-1] 3-10.) ILA responds that Allied's argument is misplaced, as Allied overgeneralizes the testimony and reports. ILA states that "Allied simply does not like the opinions expressed that the Compensation Agreement between ILA and Allied was not entered into in violation of the requirements of Rule 1.8." (Opp. of ILA to Allied's Mot. [DN 161] 1.)

As it did with respect to Hodes, the Court finds that Fortune and Haley's opinions are admissible in light of the fact issues concerning Rule 1.8(a)(1). To determine whether the written Compensation Agreement was "fair and reasonable" to Allied, the jury will need to understand the applicable rules, as well as how the parties' transaction fits therein. Fortune and Haley's testimony will be permitted. Allied's motion [DN 140] is **DENIED**. Of course, the legal question of the fee agreement's enforceability remains one for the Court.

### E. AMOUNT OF DISTRIBUTIONS

In its summary judgment motion, ILA next argues that it is entitled to summary judgment for 5% of $45,130,515 in Distributions, plus interest. The agreement defines a "Distribution" as:

> any dividend, payment or distribution of cash, securities or other tangible or intangible property to any holder of capital stock of Allied ("Allied Stockholder") or to any Affiliate (defined below), including, specifically, dividends, payments or distributions from Allied directly and dividends, payments or distributions which an Allied Stockholder or Affiliate receives from another party in connection with a transaction or series of related transactions in which such dividend, payment, or distribution results in a reduction in payments Allied otherwise would have reached.

(Comp. Agr. [DN 144-1] 1-2.) From this definition, the parties agreed that in no event shall "(i) a payment or distribution to any Allied Stockholder or any Affiliate in an arms-length transaction in which Allied receives fair market consideration for such payment or distribution, or (ii) any payment to Chester Thomas as reasonable salary for services provided to Allied" be deemed a Distribution. (Id.)

ILA argues that discovery in this case has established that between 2007 and 2012, Allied recorded in its own contemporaneous general ledger accounting entries, as well as in its compiled financial statements and tax returns, twenty-eight transfers totaling $43,566,639, which it deemed distributions. Further, ILA notes that Allied's designated accounting expert has acknowledged that transfers totaling $1,563,876 that were not characterized in Allied's books as "distributions" were nevertheless subject to the Compensation Agreement's 5% payment obligation. Accordingly, ILA argues that it is entitled to partial summary judgment in the amount of 5% of $45,130,515— or $2,256,525—plus interest compounded annually at the statutory rate of 8%, beginning on the distribution date for each transaction, as recorded in Allied's general ledgers. (See Ky. Rev. Stat. § 360.010.) In its summary judgment motion, ILA includes a chart which sets out the date and amount of each alleged distribution, as well as the page of Allied's general ledgers and financial statements where the distributions were recorded. ILA states that each entry had the effect of reducing, on Allied's balance sheet, shareholder equity and retained earnings. (See ILA's Mem. [DN 144] 10-11.)

Allied argues that ILA's computations are incorrect, as they "depend[] on its proposition that the defined term Distribution, as that term is used in the Compensation Agreement, is synonymous with an accounting distribution and thus that Allied's booking of transactions as distributions in its books and records constituted an admission that they were capital 'D' Distributions to which ILA was entitled to a 5% share." (Allied's Mem. in Resp. & Opp. to ILA's Mot. [DN 164] 28.) Allied states that under the Compensation Agreement's terms, not all accounting distributions are capital "D" Distributions, as the Compensation Agreement expressly excludes accounting distributions for which Allied receives fair market consideration. Magistrate Judge Brennenstuhl has stated already made such a conclusion, noting:

> The Compensation Agreement utilizes the term "Distribution" in a defined way to identify certain financial transactions to which ILA is entitled to share. Distribution is also a general accounting term with a different meaning.

(Order DN 133] 2, n.2.) Allied argues that ILA's computations are thus incorrect, as they fail to consider that Allied received "fair market consideration" for the accounting distributions it made, such that those distributions are not capital "D" Distributions under the Compensation Agreement. In this respect, Allied argues it received "fair market consideration" for some of its distributions, as the "indirect benefits" it received were reasonably equivalent to the amount of the transfer.

There are four main categories of transactions at issue. The parties dispute whether they fall within the definition of "Distribution," as that term is used in the Compensation Agreement. The four categories are: (1) situations where Allied wrote-off or forgave receivables due from an Affiliate; (2) situations where Allied made cash payments to Thomas for taxes; (3) situations where Allied paid "bonus" payments to Thomas; and (4) a distribution in August 2011 relating to a "Slurry Injection Rights Purchase Agreement" and "Promissory Note" between Allied and Cochise. (See ILA's Mem. [DN 144] 11-14.) Allied argues that each of these distributions are not Distributions within the meaning of the Compensation Agreement, as it received "fair market consideration" for the transfers or the transfers constituted "reasonable salary" to Thomas. (See Allied's Mem. in Resp. & Opp. to ILA's Mot. [DN 164] 36-37.)

The Court has reviewed the four main categories of transactions at issue and concludes that there are genuine disputes of material fact that preclude summary judgment on whether the transfers are "Distributions," as that term is defined in the Compensation Agreement. As for the first, second, and fourth categories, the Court finds that genuine disputes of material fact exist concerning whether Allied received "fair market consideration" for the transfers. As for the third category, the Court finds that genuine disputes of material fact exist concerning whether "bonus"

distributions to Thomas constitute "reasonable salary." The parties have each proffered expert testimony on these issues, and the Court finds that such testimony should be heard. The issues are simply not appropriate ones for the Court to decide on summary judgment. Therefore, ILA's motion [DN 141] is **DENIED** as to its request for summary judgment on the issue of the amount of Distributions under the Compensation Agreement.

**Offsetting Distributions with Negative Distributions or Contributions.** In addition to arguing that certain distributions are not Distributions, Allied also argues that GRC, Thomas, and other affiliates made contributions (or "negative distributions") to Allied, and that the "negative distributions" should offset the total amount of Distributions that are subject to the Compensation Agreement's payment requirements. Allied states that such a methodology "serve[s] what Smith testified was the purpose behind including inter-company distributions in the Compensation Agreement, *i.e.*, to avoid having Allied's net worth bled off to its affiliates." (Id. at 37-38.) Allied argues that if inter-company transfers from Allied to its affiliates are offset by similar transfers back from those affiliates to Allied, then Allied's net worth will have been preserved.

ILA argues that the Court must dismiss this argument, as the Compensation Agreement's plain terms do not provide for any "offsetting" of Distributions. ILA argues that if the parties had intended to reduce Allied's obligations under the Compensation Agreement through "negative distributions" or "contributions," they could have included such language. Because they did not, Allied's argument should be rejected as a matter of law. See Alexander v. Theatre Realty Corp., 70 S.W.2d 380, 387-88 (Ky. 1934) ("There is no better established rule of law in this state than that a court cannot make a contract for the parties, but can only construe the contract it finds they have entered into. Nor has the court the authority to read words into a contract.").

ILA further argues that adopting Allied's position would be contrary to the Compensation Agreement's instruction that payments shall be made to ILA "at the time" as any Distribution is paid. (Comp. Agr. [DN 144-1] 1.) ILA states that under this language, it is not appropriate for Allied to offset transactions that never appeared in the company's books, years after the fact—especially in light of the parties' agreement that Allied's "books and records shall contain an accurate and complete account of all items required to calculate any Distributions . . . ." (Id. at 2.) For example, ILA states that Allied cannot properly claim that it is entitled to an "offset" because Steamport could or should have charged Allied more for barge loading services between 2005 and 2012. (See Terry Walker Dep. [DN 144-16] 249-52 (proffering his opinion that Allied is entitled to an offset for $8,144,360, as the fair market value for barge loading would have been $1.75 per ton during the relevant period, and Allied only paid $1.07, leaving a $0.68 variable).) ILA states that Allied similarly cannot claim that it is entitled to an "offset" since GRC charged no interest to Allied when it distributed proceeds of an Industrial Revenue Bond loan. (Id. at 274.)

Allied counters that under Kentucky law, contracting parties may offset obligations owed to one another absent contractual language to the contrary. See U.S. Dep't of Agriculture Rural Housing Serv. v. Riley, 485 B.R. 361, 364 (W.D. Ky. 2012) ("The right to setoff permits entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."). According to Allied, in light of this rule, the absence of language addressing offsets in the Compensation Agreement means that offsets are permitted. Allied states that at minimum, it should be entitled to net offsetting Distributions that were made prior to the Distributions for which ILA seeks payment. Further, Allied states that the Compensation Agreement only requires Allied to keep books from which Distributions can be calculated. As such, the fact that Allied did not initially book certain transactions as distributions

to Allied cannot preclude Allied from seeking to offset them now. (Allied's Mem. in Resp. & Opp. to ILA's Mot. for Partial Summ. J. [DN 164] 38-39.)

The Court agrees with ILA. In this case, Allied is not seeking to offset payments owed to ILA against payments that ILA owes to Allied. Instead, Allied is seeking to reduce or eliminate payments it owes to ILA by deducting various payments that Allied received from its affiliates from the Distributions Allied made to its affiliates and owners. The cases cited by Allied are thus distinct. Under the plain terms of the Compensation Agreement, Allied may not seek credit for "offsetting transfers." The Compensation Agreement nowhere indicates that this is acceptable. While the Compensation Agreement outlines exceptions to the Distribution/payment requirement, including the exception for transfers "for market consideration" and the exception for transfers to Thomas that constitute "reasonable salary," there is no exception for Allied's intercompany offsets. ILA's motion [DN 144] is **GRANTED** in this respect. Allied's argument is rejected.

### F. ALLIED'S OFFSET OF LIABILITY THROUGH MALPRACTICE CLAIM

It is undisputed that on August 14, 2001, Cochise filed a declaratory judgment action in this Court against P&M, alleging that Cochise had no contractual obligation to pay the $1 million purchase price for the Sebree Mine. P&M counterclaimed for the $1 million. On December 18, 2003, this Court resolved the parties' cross-motions for summary judgment. It held that while the § 2.7.1 of the Asset Purchase Agreement between Cochise and P&M relating to the purchase price set-off for miners actually hired made reference to Cochise "or its assigns," this critical language had been omitted from § 2.7.5 relating to the purchase price set-off for miners to whom offers of employment were made but not accepted. (Dec. 18, 2003 Mem. Op. & Order [DN 164-1] 14.) As a result, Cochise was entitled to a $650,000 offset. (See Mar. 30, 2004 Mem. Op. & Order [DN 144-11] 3.) The parties dispute whether ILA was responsible for the error. While ILA

denies any responsibility, Allied argues that ILA was responsible—and that as a result, it now has a valid set-off defense based on ILA's legal malpractice. According to Allied, ILA committed malpractice by omitting the "or its assigns" language when drafting § 2.7.5 of the Cochise-P&M Asset Purchase Agreement. Allied states that this malpractice entitles it to a set-off in this case.

ILA first argues that Allied cannot assert a malpractice claim that belongs to a non-party, Cochise, relating to an agreement Allied did not sign. ILA states that as a matter of law, Allied cannot raise Cochise's potential malpractice claim as grounds to avoid its contractual obligations. ILA cites Baker v. Coombs, in which the Kentucky Court of Appeals noted that "[d]ue to the highly personal nature of the attorney-client relationship, a legal malpractice claim 'may accrue only to the attorney's client." 219 S.W.3d 204, 208 (Ky. App. 2007). Allied also cites American Continental Insurance Co. v. Weber & Rose P.S.C., in which that Court held that an insurer could not bring a malpractice claim against its insured's attorney on a subrogation theory, as an "attorney-client relationship is personal in nature." 997 S.W.2d 12, 13-14 (Ky. App. 1998).

Allied counters that at a minimum, there are genuine fact issues as to whether it was the intended beneficiary of ILA's services in drafting the Cochise-P&M Asset Purchase Agreement. During Smith's deposition, he stated that the "principal focus" of his work "was preserving the Allied Onton Reserves without any potential obligations." (Smith Dep. [DN 164-6] 56.) Further, Allied states that the offset listed in § 2.7.5 was intended to cover Allied's purchase of the Onton Reserves and Cochise's purchase of the Sebree Mine. Allied argues that Kentucky law recognizes that intended beneficiaries of an attorney-fee agreement may assert a claim for malpractice or negligence against the attorney. See Goodman v. Goldberg & Simpson, P.S.C., 323 S.W.3d 740, 747 (Ky. App. 2009) ("Attorneys may be held liable for professional negligence where third parties were the intended beneficiaries of their legal representation.").

But as the Kentucky Court of Appeals noted in <u>Goodman</u>, in cases where an attorney may be held liable for professional negligence by third parties, the attorney's services must have been "'primarily and directly intended to benefit' the third party." <u>Id.</u> (citation omitted). The Court finds that here, there is no genuine issue of fact as to whether ILA's work relating to § 2.7.5 of the Cochise-P&M agreement was "primarily and directly intended to benefit" Allied. It was not. Allied is nowhere mentioned in the Cochise-P&M agreement, and any such argument that the agreement was intended for Allied's benefit is contradicted by the agreement itself, which states that there are no third-party beneficiaries. (<u>See</u> Cochise-P&M Asset Purchase Agr. [DN 144-8] § 16.2 ("No Person other than the parties to this Agreement shall have any legal or equitable right, remedy or claim under or with respect to this Agreement or any portion of this Agreement.").)

Moreover, the Court finds that Allied's malpractice "affirmative defense" is barred by the statute of limitations. As Kentucky's highest court has stated, "Kentucky practice limitations will not bar 'mere defenses' arising out of the transaction connected with a plaintiff's claim." <u>Empire Finance Co. of Louisville, Inc. v. Ewing</u>, 558 S.W.2d 619, 622 (Ky. Ct. App. 1977). Further, a claim that might otherwise be barred may be asserted in the form of recoupment. <u>Bull v. United States</u>, 295 U.S. 247, 262 (1935) ("[R]ecoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.") However, here, ILA's action is grounded on the parties' Compensation Agreement—not the Cochise-P&M agreement—and a review of Allied's response brief indicates that its malpractice "affirmative defense" is nothing more than a counterclaim in disguise. (Allied's Mem. in Resp. & Opp. to ILA's Mot. [DN 164] 25 (citing cases involving claims brought by intended beneficiaries of an attorney-fee agreement).) Indeed, Allied is not merely asserting a defense. It is bringing a legal

malpractice counterclaim, in which it would be required to prove the elements of its claim and in which it seeks $687,000, plus legal fees. (Id. at 3.) The statute of limitations must be satisfied.

The Court finds that if Allied were permitted to bring this claim (which the Court has held it is not), then at the latest, it arose on December 19, 2003, when the Court issued its order on Cochise and P&M's cross-motions for summary judgment. Since professional malpractice cases under Ky. Rev. Stat. § 413.245 are subject to the one-year statute of limitations, even when brought as counterclaims, Allied's malpractice claim is time-barred. See Lucchese v. Sparks-Malone, PLLC, 44 S.W.3d 816, 817-18 (Ky. App. 2001) (finding that a counterclaim was time-barred, as it was not brought within one year after the last legal service was rendered); Harvey Coal Corp. v. Smith, 268 S.W.2d 634, 635 (Ky. 1954), *over'd on other grounds*, Armstrong v. Logsdon, 469 S.W.2d 342 (Ky. 1971) (noting that while "the statute of limitations is not intended to and does not bar the use of a counterclaim for the purpose of pure defense to an action, . . . a demand for damages based upon a tort, when pleaded by way of counterclaim, is regarded as an affirmative action and . . . is amenable to the operation of the statute of limitations and is unavailable if barred by it"). ILA's motion [DN 141] is **GRANTED** on this issue.

### G. ILA'S MOTION TO EXCLUDE THE OPINIONS OF THE DEFENDANT'S DAMAGES EXPERTS [DN 146]

ILA moves the Court to exclude the opinions and testimony of Terry Walker ("Walker"), James N. Heller ("Heller"), and Kenny Lanham ("Lanham"). Walker has been retained as Allied's accounting expert. He joined Riney Hancock CPAs, P.S.C. in 1976 and became a shareholder in 1983. For more than 25 years, he has "provided a full-range of litigation support and consulting services" in myriad matters, including business valuations, damage determinations, and contract disputes. (Walker Rep. [DN 148-3] App'x III.) Walker opines that there were approximately $1.6 million of Distributions subject to the Compensation Agreement. He also opines that there are

"offsetting transfers from the Affiliates back to Allied – negative distributions – of approximately $19.3 million." (Id. at 4.) From these figures, Walker concludes that "there are **negative** net Distributions subject to the Compensation Agreement of about $17.7 million," such that "there are **no** payments/distributions subject to the 5% specified in the Compensation Agreement." (Id.) ILA argues that these opinions must be dismissed because they are based on erroneous principles of law and incorrect interpretations of the Compensation Agreement at issue.

**$1.6 Million of Distributions.** Walker opines that Allied made $1,563,876 in payments that meet the definition of Distributions under the Compensation Agreement. Walker calculates this number by taking the total amount of payments reflected in Allied's books and records as having been made by Allied to its affiliates or stockholders, and then deducting amounts which Walker contends provided Allied with a "fair market consideration" or constituted "reasonable salary" to Thomas. (Id. at 9-14.) ILA argues that this opinion is inadmissible, as it is based on the incorrect legal assumption that Allied's receipt of a purported "benefit" is synonymous with the receipt of "fair market consideration." (Mem. in Supp. of ILA's Mot. to Exclude Ops. of Def.'s Damages Experts [DN 148] 3, 7-8.) Allied responds that to determine "fair market consideration," the determinative issue will be whether Allied received a corresponding benefit for its transfer, either directly from the transferee or indirectly from a third party. Allied states that Walker's opinions are relevant to this issue, and would be helpful to the jury. (See Mem. in Resp. & Opp. to ILA's Mot. to Exclude Ops. of Def.'s Damages Experts [DN 162] 8.)

The parties' dispute concerning Walker's testimony centers on their differing viewpoints of the meaning of "fair market consideration," as well as their differing viewpoints on how the parties should calculate "Distributions" under the Compensation Agreement. ILA argues that by excluding transfers that were for "fair market consideration," the parties did not intend to exclude

all transfers for which some "benefit" was received. In other words, ILA advocates for a more limited view of the phrase "fair market consideration." ILA states that "fair market consideration" is not synonymous with "benefit." Instead, "fair market value" is "the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction." Black's Law Dictionary (9th ed.) "Consideration" presupposes the existence of a contract and is defined as "a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." Smith v. Bethlehem Sand & Gravel Co., 342 S.W.3d 288, 293 (Ky. App. 2011).

Allied argues that when the parties agreed to exclude transfers that were for "fair market consideration," they did intend to consider whether direct or indirect benefits were provided to Allied. In other words, Allied advocates for a broad view of the phrase "fair market consideration." Allied states that such an interpretation is consistent with underlying legal principles, as courts have considered whether a transferor has received a corresponding benefit for its transfer in the analogous setting of fraudulent transfer claims, when the issue is whether "fair consideration" or "reasonably equivalent consideration" exists. In this respect, Allied cites Rubin v. Manufacturers Hanover Trust Co. for the proposition that "[i]f the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and [fair consideration] has been satisfied . . . ." 661 F.2d 979, 991-92 (2d Cir. 1981).

The Court finds that both parties have provided reasonable interpretations of the contract language. The term "fair market consideration" is not defined, and it is ambiguous. Further, the Court finds that in this case, factual development is necessary to determine the parties' intent. See Lomree, Inc. v. Pan Gas Storage, LLC, 499 Fed. App'x 417, 420 (6th Cir. 2012) (internal quotations and citations omitted) ("If the contract is subject to two reasonable interpretations,

factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate."). Thus, the Court finds that it would be improper to exclude Walker's opinions in this case. This is especially true in light of the fact that generally, "the question of whether reasonably equivalent value has been given for a transfer of property is a question of fact." *In re* Se. Waffles, LLC, 460 B.R. 132, 139 (6th Cir. 2011). Walker should be permitted to explain Allied's defense to the jury, including its argument that there was "fair market consideration" for the distributions Allied made. ILA's motion [DN 146] is **DENIED**.

Similarly, the Court finds that to the extent ILA argues that Walker's opinions apply an erroneous interpretation of the Compensation Agreement, that argument is rejected. ILA argues that Allied's books and records reflect tens of millions of dollars paid from Allied to Thomas, GRC, and other Allied affiliates. According to ILA, Allied has characterized those payments as "distributions," and Walker has conceded that nearly all of such transfers meet the definition of "distribution" under Generally Accepted Account Principles ("GAAP"). (See Mem. in Supp. of ILA's Mot. to Exclude Ops. of Def.'s Damages Experts [DN 148] 5 (citing Walker Dep. [DN 148-2] 243-44, 182, 230-31).) ILA argues that in light of these facts, Walker cannot claim that these payments must be "exempted" because Allied "benefitted" from the payments it made. ILA states that such a claim "contradicts the principles of his accounting profession." (Id. at 9.)

But again, the Court finds that Walker's testimony should not be excluded. While ILA and its experts are certainly entitled to argue that Walker's claims contradict various accounting principles, Allied and its experts are equally entitled to argue that the term "Distribution," as it is defined in the Compensation Agreement, expands beyond those principles. There are genuine disputes of material fact concerning the "fair market consideration" exclusion, the "reasonable salary" exclusion, and the parties' intent behind the Compensation Agreement. The Court finds

that Walker's testimony would be helpful in analyzing Allied's books and records, as well as the relevant accounting principles. This testimony would undeniably assist the trier of fact.

**Offsetting Transfers.** Walker next opines that the Compensation Agreement requires the Court to reduce the amount of Distributions by "negative distributions" or "offsetting transfers." (Walker Rep. [DN 148-3] 4, 14-15, 20.) In this section of his opinion, Walker relies on a letter from Lanham, the president and co-owner of Kodiak Resources, to support his opinion that Allied is entitled to an offset since Steamport could or should have charged Allied more in barge loading fees. Lanham has spent years in the coal industry, and the river transportation sector, and opines that "the rate charged ($1.07) by Steamport to Allied for transloading, fleeting and switching, was substantially below the fair market price during the period 2005 through 2012," as "a fair market value for the Allied tonnages loaded by Steamport to Allied should have been $1.75 for the period in question." (Oct. 11, 2013 Letter [DN 148-11] 1.) Walker also relies on the report of an economist, Heller, to support his opinion that Allied is entitled to an offset since GRC should have booked (but failed to book) certain capital/interest charges as a receivable from Allied when it passed through the proceeds of the Industrial Revenue Bond loan to Allied. Heller opines that in December of 2004, a fair market rate of return in an arms-length financing for Allied's $18 million development of the Onton Mine would have been 19.5%. (Heller Rep. [DN 148-10].) ILA argues that Walker's opinions, along with Lanham and Heller's opinions, must be excluded, as the Compensation Agreement does not permit such "offsetting transfers."

As noted earlier in this opinion, the Court agrees with ILA that the Compensation Agreement's plain and unambiguous terms do not allow "offsetting transfers," "negative distributions," or "contributions." Accordingly, the Court finds that Walker's testimony on such issues is irrelevant, impermissible, and **EXCLUDED**. ILA's motion [DN 148] is **GRANTED** in

this respect. Further, since the only purpose of Heller and Lanham's proffered testimony is to provide figures for certain of these "offsetting transfers," their opinions are likewise irrelevant, impermissible, and **EXCLUDED**.

### H. ALLIED'S MOTION TO EXCLUDE OR LIMIT THE EXPERT TESTIMONY OF W. DOUGLAS BLACKBURN [DN 142]

ILA has submitted the expert report of W. Douglas Blackburn ("Blackburn"). Blackburn is proffered to offer a rebuttal to Heller's "central conclusion, i.e., that 'the amount of debt that could reasonably be assumed to be obtainable for this [financing] project would be modest' and would be mostly equity." (See Blackburn Report [DN 142-5].) Allied argues that Blackburn's criticisms are impermissible since they are "based on an erroneous reading of both Mr. Heller's opinions and the underlying data." (Allied's Mem. in Supp. of Mot. to Exclude or Limit the Testimony of W. Douglas Blackburn [DN 142-1] 3.) The Court, however, has excluded Heller's opinion that the fair market rate of return for an arms-length financing in December 2004 of Allied's $18,000,000 development of the Onton Mine was 19.5%, on the grounds that the Compensation Agreement does not allow "offsetting transfers," "negative distributions," or "contributions." Accordingly, ILA will not need to call Blackburn as a rebuttal expert. (See ILA's Opp. to Allied's Mot. to Exclude the Ops. of Blackburn [DN 160] 2.) Allied's motion [DN 142] is **DENIED** as moot.

### I. ALLIED'S MOTION TO EXCLUDE OR LIMIT THE EXPERT TESTIMONY OF ELIZABETH WOODWARD [DN 145]

Elizabeth Woodward ("Woodward") is a Certified Public Accountant and is Certified in Financial Forensics. She is employed by Dean Dorton Allen Ford, PLLC in Lexington, Kentucky, as a Director of Litigation Support and Forensic Accounting. (Woodward Rep. [DN 147] Att. C.) Woodward seeks to testify, among other things, that the net revenues generated to Allied from its

asset sale to Alliance should be treated as a Distribution, and that an accountant's designation of a transfer as a "distribution" signifies that the transfer was not "for value" (and thus was not for "fair market consideration"). Woodward also seeks to testify that Allied's accounting records are reliable, reflecting at least $43,566,639 in distributions subject to the payment requirement. In its motion to exclude Woodward's testimony, Allied argues that her opinions depend on a construction of the Compensation Agreement which is incorrect as a matter of law. Allied argues that the definition of "Distribution" under the Compensation Agreement is different than the definition of "distribution" in accounting, and that Woodward fails to recognize this fact.

The Court again finds that in light of the factual issues concerning the parties' intent in entering the Compensation Agreement, and in light of the fact that accounting experts are needed to assist the jury in understanding the pertinent accounting records and principles, as well as whether certain transfers were made for "fair market consideration," it is not permissible to exclude Woodward's proffered expert testimony. In this case, the parties have each retained their own accounting experts to discuss the Compensation Agreement and the categorization of certain transfers as "Distributions" thereunder. The Court will allow their testimony. In short, the fact that each party disagrees about the substance of the other party's expert testimony is not grounds for exclusion. Allied's motion to exclude Woodward's testimony [DN 145] is **DENIED**.

The Court notes that on March 25, 2014, after the deadline for submitting expert reports had passed and after her deposition had been taken, Woodward submitted a supplemental report. Allied argues that this supplemental report must be excluded, as untimely, pursuant to Fed. R. Civ. P. 16. The Court finds, however, that this report has not caused Allied to suffer any undue prejudice. Further, "good cause" exists to allow Woodward to testify about the report's contents. As ILA notes, Woodward's supplemental opinions were made in response to information which

was revealed during the deposition of Allied's accounting expert, Walker. Walker's deposition occurred on January 27, 2014, after Woodward's initial and rebuttal reports were provided and only two days before discovery was scheduled to close. She provided her supplement within a reasonable time after his deposition. Thus, the Court will not exclude her supplemental opinions. See Porter v. Hamilton Beach/Proctor-Silex, Inc., 2003 WL 21946595, at *6 (W.D. Tenn. July 28, 2003) ("Rule 26(e) does not prohibit an expert from supplementing his disclosures based on information thereafter received from the opposing party."); Roby v. Midstates Indus. Grp., Inc., 2007 WL 275359 (W.D. Ky. Jan. 24, 2007) (denying a motion to exclude a supplemental expert report where no trial date was set). Notably, no trial date has yet been set in this case, and "ILA is prepared to make Ms. Woodward available for a second deposition, limited to questions regarding her March 25 supplemental report," if desired by Allied. (See ILA's Opp. to Allied's Mot. to Exclude or Limit Testimony by Elizabeth Woodward [DN 169] 24-25.)

### J. ILA'S MOTIONS FOR ORAL ARGUMENT [DNS 150, 167]

As a final matter, ILA has moved for an oral argument on these issues. These motions are **DENIED**, as the Court finds that an oral argument is unnecessary at this point in the litigation.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that ILA's Motion for Partial Summary Judgment [DN 141] is **GRANTED** in part and **DENIED** in part, consistent with this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that Allied's Motion for Summary Judgment [DN 149] is **DENIED**.

**FURTHER** that ILA's Motion to Exclude the Opinions of Peter Ostermiller, Esq. [DN 138] is **GRANTED**.

**FURTHER** that ILA's Motion to Exclude the Opinions of W. William Hodes, Esq. [DN 139] is **DENIED**.

**FURTHER** that Allied's Motion to Exclude or Limit the Expert Testimony of William Fortune and Leslie Haley [DN 140] is **DENIED**.

**FURTHER** that Allied's Motion to Exclude or Limit the Expert Testimony of W. Douglas Blackburn [DN 142] is **DENIED** as moot.

**FURTHER** that Allied's Motion to Exclude or Limit the Expert Testimony of Elizabeth Woodward [DN 145] is **DENIED**.

**FURTHER** that ILA's Motion to Exclude the Opinions of the Defendant's Damages Experts [DN 146] is **GRANTED** in part and **DENIED** in part, consistent with this Memorandum Opinion and Order.

**FURTHER** that ILA's Motions for Oral Argument [DNs 150, 167] are **DENIED**.

*Joseph H. McKinley*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

August 25, 2014

cc: counsel of record